[No. 13082. Department One. December 5, 1916.]

THE STATE OF WASHINGTON, *Respondent*, v.
CLYDE L. BONHAM, *Appellant*.[1]

PHYSICIANS AND SURGEONS—REGULATION—LICENSE TO PRACTICE—
STATUTES—CONSTITUTIONALITY. Rem. 1915 Code, § 8392, requiring
applicants for licenses to practice medicine and surgery to present
a diploma the requirements of which shall have been "in no par-
ticular less than those prescribed by the Association of American
Medical Colleges for that year," is not unconstitutional as granting
legislative functions to such association.

SAME. Such provision could not be objected to by one applying
for a license to practice osteopathy, as he was not affected by it, and
it will not render the whole act unconstitutional.

SAME—REGULATION—LICENSE TO PRACTICE—METHODS EMPLOYED—
OSTEOPATHS—STATUTES. The medical act having made a distinction
between the practicing of medicine and osteopathy, confining the
practitioners of each to the system they profess to practice; and the
practice of osteopathy, at the time of the passage of the act, being
confined to treatment without drugs or surgery; one licensed only
to practice osteopathy is guilty of a misdemeanor in treating a
patient by cutting out the tonsils and administering medicine, to
wit, stypticene, under Rem. 1915 Code, §§ 8386-8407, section 8406
making it incumbent upon the holder of a certificate, under penalty
of a misdemeanor, to use no deception in the use of titles of his or
her mode of treating the sick and to use only such title as he or she
holds license to practice.

Appeal from a judgment of the superior court for King
county, Ronald, J., entered September 2, 1915, upon a trial
and conviction of practicing medicine without a license. Af-
firmed.

*Charles H. Miller*, for appellant.

*Alfred H. Lundin*, *W. F. Meier*, and *Joseph A. Barto*, for
respondent.

FULLERTON, J.—The defendant, Clyde L. Bonham, was
convicted of the crime of practicing medicine and surgery
within King county, state of Washington, without a certificate

[1]Reported in 161 Pac. 377.

from the board of medical examiners of the state authorizing him so to do, and sentenced to pay a fine of one dollar, together with the cost of the prosecution. From the conviction and sentence, he appeals.

The cause was tried before the lower court upon an agreed statement of facts. The statement shows that the appellant, at the time named in the information, was the holder of a valid, unrevoked certificate issued to him by the board of medical examiners of the state of Washington authorizing him to practice osteopathy in such state, but was not the holder of any of the other forms of certificates the medical board is authorized to issue, and was entitled to practice medicine and surgery in the state of Washington only in such manner as his certificate authorizing him to practice osteopathy entitled him so to do; that, on the day named in the information, one Ray Johnson applied to the appellant to be treated for a diseased condition of the tonsils; that the appellant thereupon undertook his treatment, and in the course thereof administered to him "an anesthetic, to wit, ether, and then and there, removed the tonsils of the said Ray Johnson, by placing a snare around each of said tonsils, and then and there cutting out said tonsils with a knife, . . . and then and there administered to the said Ray Johnson medicine, to wit, stypticene, . . .;" that the method employed was the only method for removing the tonsils, and the method used "was the only method in which the said Bonham received instruction" for the removal of diseased tonsils. The stipulation further shows that the appellant matriculated in the Los Angeles College of Osteopathy, of Los Angeles, California, in January, 1906, and graduated therefrom in June, 1908, after having completed the course of study prescribed by such college. It is shown also that the college named was a legally chartered college of osteopathy, requiring actual attendance, and having a course of instruction of more than twenty months.

The statutes of this state regulating the practice of treating the sick and afflicted (Rem. 1915 Code, §§ 8386-8407) provide for the appointment of a board of medical examiners consisting of nine members, five of whom must be chosen from the regular profession, two from the homeopathic profession, and two from the osteopathic profession. The board is given power to issue certificates to those entitled to practice the healing art, and practicing such art without holding such a certificate is made a misdemeanor. The board has authority to issue three forms of certificates:

"First, a certificate authorizing the holder thereof to practice medicine and surgery; second, a certificate authorizing the holder thereof to practice osteopathy; third, a certificate authorizing the holder thereof to practice any other system or mode of treating the sick or afflicted not referred to in this section." Rem. 1915 Code, § 8391.

In order to procure a certificate to practice medicine and surgery, applicants must present to the board "a diploma issued by some legally chartered medical school, the requirements of which shall have been at the time of granting such diploma in no particular less than those prescribed by the Association of American Medical Colleges for that year," together with certain prescribed preliminary and extraneous proofs; such, for example, as that the applicant is of good moral character and that the diploma was not obtained by fraud. To obtain a certificate to practice osteopathy, the applicant is required to present a diploma from "a legally chartered college of osteopathy, having a course of at least twenty months, requiring actual attendance, and after 1909, of three years of nine months each," together with proofs similar to those of the applicant's first mentioned. An applicant for a certificate to practice any mode or system of healing the sick or afflicted is required to file a diploma from a legally chartered college of the system or mode of treatment which the applicant claims or intends to follow. In addition to the foregoing requirements, all applicants for cer-

tificates must be personally examined by the board as to their qualifications in the "following fundamental subjects, to wit: anatomy, histology, gynecology, pathology, bacteriology, chemistry and toxicology, physiology, obstetrics, general diagnosis and hygiene. Examinations in each subject shall consist of not less than ten questions, none of which shall relate to treatment." Rem. 1915 Code, § 8392.

Under the penalty of a misdemeanor, the act makes it incumbent on holders of certificates to "use no deception in the use of titles of his or her mode of treating the sick, but shall use only such titles as are designated by his or her diploma; or those not having a diploma shall use only such title as he or she holds license to practice." Rem. 1915 Code, § 8406. It is provided, also, that the act shall not be construed so as to discriminate against any particular school of medicine or surgery, or against osteopathy or any system or mode of treating the sick or afflicted, or so as to interfere in any way with the practice of religion, or be held to regulate any kind of treatment by prayer. The statute offers no definition of medicine and surgery, or of osteopathy, or of other modes of treatment mentioned for which certificates to practice may be issued, nor does it undertake to prescribe specifically what mode of treatment the holders of the various certificates may employ in their practice.

The appellant assails the judgment of conviction pronounced against him on two special grounds; first, that the act is unconstitutional; and, second, that his certificate entitles him to employ for the treatment of diseased tonsils the methods employed by him in the treatment of the diseased tonsils of the patient mentioned in the information.

The first objection needs no extended discussion. The question has been twice before this court with reference to this particular act; first, in the case of *State v. Greiner*, 63 Wash. 46, 114 Pac. 897, and later in the case of *State v. Pratt*, 80 Wash. 96, 141 Pac. 318, in each of which the constitutionality of the act was sustained as being within the

police powers of the state. The appellant's learned counsel, however, suggests a reason for holding the act unconstitutional not suggested in the arguments in the cases cited, and this it may be well to specifically notice. The objection, stated in the language of counsel, is this:

"When the legislature of 1909 incorporated in section 8391 of the act the following language: 'In order to procure a certificate to practice medicine and surgery the applicant for such certificate must file with said board, at least two weeks prior to the regular meeting thereof, satisfactory testimonials of good moral character, and a diploma issued by some legally chartered medical school, the requirements of which shall have been at the time of granting such diploma in no particular less than those prescribed by the Association of American Colleges for that year,' they granted to the American Medical Association, a nonlegislative body outside of the state, legislative functions, and by so doing aimed to establish a medical hierarchy, which would control the people from birth to death. The bureaucratic rule which it hoped to secure by the passage of that section is un-American in principle and despotic in spirit. It is monopolistic and tyrannical in the most offensive sense of those terms."

But we think it manifest that the clause quoted by counsel cannot bear the construction he places upon it. By this clause, the legislature granted legislative functions to no one. It simply defined the medical schools from which an applicant to practice medicine and surgery in the state must produce a diploma before a certificate authorizing him to do so can be issued to him. The restriction may or may not be a wise one, but this is a question for the legislature and not for the courts. With the courts, the question is one of the power of the legislature to impose the restriction, and we see no reason to question it.

Again, we think the restriction is not one of which the appellant can be heard to complain. He is in no manner affected by it. He applied for and received a certificate to practice osteopathy, and is entitled to practice that profession in the manner and to the extent the certificate permits. It may be

that, should it be held that this particular clause was unconstitutional and that it so far permeated the act as to render it void in its entirety, the appellant would be entitled to an acquittal for the want of a statute on which to base the prosecution. But the statute was enacted in the interest of the public. It was for the protection of the people, and is not to be held unconstitutional as a whole because of the insertion of an unconstitutional restriction unless no other alternative is presented. It is our opinion that we would not be driven to hold the entire act unconstitutional, even though we held the particular restriction invalid; but would be required to hold that the restriction can be rejected and still leave the act enforcible as to its other restrictive and regulative features. Without further pursuing the inquiry, we conclude that the appellant is not entitled to a reversal on the ground of unconstitutionality of the act.

Passing to the second contention, the statute makes it plain, we think, that its framers regarded the practice of medicine and surgery and the practice of osteopathy as separate and distinct methods of treating the sick and afflicted, and intended to confine the practitioners of each to the particular system he professed to practice; in other words, to the system in which he had been educated. It is true, no definition of these terms was offered in the statute, but this would only mean that the terms were used in their general and accepted sense, in the sense in which they were commonly understood at the time of the enactment of the statute. In considering the contention, therefore, we are not particularly concerned with the meaning of the term medicine and surgery, but rather with the meaning of the term osteopathy; the inquiry being, was the method adopted by the appellant in the treatment of the particular patient a recognized method for the treatment of such a disease under the school of treatment known as osteopathy? If it was a recognized treatment according to that school of treatment, the appellant had a

right to practice it under his certificate from the medical board, if it was not so recognized, he did not.

To determine the meaning of the term osteopathy, resort may be had to the definition and descriptions of it given by the founder of the practice, by those who teach and practice it, and by the lexicographers who define it as a science. The practice was founded by Dr. A. T. Still in about the year 1871. He was a practitioner originally of the so-called old school, and served as a surgeon in the civil war. In the year named, he was practicing his profession at Baldwin, Kansas, when he announced to his patients that he had evolved a system of drugless healing, and that he had done with drugs forever. Shortly afterwards, he removed to Kirksville, Missouri, where he practiced his new system until 1890, when he founded a school for the instruction of others. This school was subsequently chartered by the state of Missouri under the name of the American School of Osteopathy, and was the first school organized to teach the particular form of treatment. Dr. Still described his system in the following language:

"Osteopathy deals with the body as an intricate machine, which, if kept in proper adjustment, nourished and cared for, will run smoothly into a ripe and useful old age. As long as the human machine is in order, like the locomotive or any other mechanical contrivance, it will perform the functions for which it was intended. When every part of the machine is adjusted and in perfect harmony, health will hold dominion over the human organism by laws as natural and immutable as the law of gravitation. Every living organism has within it the power to manufacture and prepare all chemicals, materials and forces needed to build and repair itself, together with all the machinery and apparatus required to do this work in the most perfect manner, producing the only substance that can be utilized in the economy of the individual. No material other than food and water taken in satisfaction of the demands of appetite (not perverted taste) can be introduced from the outside without detriment."

In the catalogue of the Los Angeles College of Osteopathy, the college from which the appellant is a graduate, osteopathy is defined in the following language:

"Osteopathy is a system of rational therapeutics which (1) recognizes that resistance, relief and recovery are functions inherent in the organization of living bodies and that a deviation from the state of health implies either the absence of some of the natural influences, agencies or conditions that maintain these functions, or derangement in their structural or organic basis, and (2) treats disease by employing as remedies (a) the natural causes of normal function, and (b) manipulation to restore normal anatomical relations."

In the catalogue of the College of Osteopathic Physicians and Surgeons of Los Angeles, California, which was formed by the amalgamation of the Los Angeles College of Osteopathy and the Pacific College of Osteopathy, the term is defined as follows:

"Osteopathy is founded on the eternal truth that each individual lives by means of his own bodily activities and will continue to live in a state of health just so long as his body is able to adapt itself to the external influence surrounding it. When adaptation fails and disease arises the osteopathic physician appeals to no charms; does not try to drive demons out with nostrums; knows too much about physiology to administer a cause of more disease in the form of a poison; takes out none of the pieces of which the human body—the most wonderful of all machines—is composed; nor is he so devoid of human sympathy and common sense that he can say to himself 'The suffering of others is imaginary.' Instead of these uninstructed ways of interpreting disease, the osteopathic physician views the problem as a natural event arising under the operation of natural law and susceptible of scientific analysis and solution. He knows that the human body is a protoplasmic machine, a chemical machine and an anatomical machine. He knows that the body as a whole must be kept in protoplasmic equilibrium, chemical equilibrium, and anatomical equilibrium. He further knows that the unceasing normal flow of nervous energy is necessary for the maintenance of protoplasmic harmony, and the unceasing, uninterrupted flow of blood is necessary for the main-

tenance of chemical harmony and union throughout the body. He knows that, given a body in equilibrium, anatomically, protoplasmically and chemically, the only things needed by it are food, water, air and exercise. Therefore, when confronted with a diseased body, the osteopathic physician proceeds, first, to correct all anatomical derangements, so that nervous energy and blood may flow without hindrance between each part of the body and every other part. This restores to the body its capacity to take advantage of the beneficial and to resist the injurious in its medium. He then surrounds it with the external agencies necessary to normal life, and the result is health."

Webster's New International Dictionary defines the term in this language:

"A system of treatment based on the theory that diseases are chiefly due to deranged mechanism of the bones, nerves, blood vessels, and other tissues, and can be remedied by manipulations of these parts."

In Funk & Wagnalls New Standard Dictionary of the English Language, the word is defined as follows:

"A system of treating diseases without drugs, propounded by Dr. A. T. Still in 1874. It is based on the belief that disease is caused by some part of the human mechanism being out of proper adjustment, as in the case of a misplaced bone, cartilage or ligament, adhesions or contractions of muscle, etc., resulting in unnatural pressure on or obstruction to nerves, blood, or lymph. Osteopathy, through the agency or use of the bones (especially the long ones which are employed as levers), seeks to adjust correctly the misplaced parts by manipulation."

In the Century Dictionary and Cyclopedia, under the word osteopathy, it is said:

"A theory of disease and a method of cure, advocated by Dr. A. T. Still, resting on the supposition that most diseases are traceable to deformation of some part of the skeleton (often due to accident) which by mechanical pressure on the adjacent nerves and vessels interferes with their action and the circulation of the blood. As a remedy a form of manipulation is used."

The case of *Bragg v. State,* 134 Ala. 165, 32 South. 767, 58 L. R. A. 925, while not in point perhaps on the main question here involved, is interesting because containing the view of a graduate of the parent school as to the teachings generally of the schools of osteopathy. He was prosecuted for practicing medicine without first having obtained a certificate of qualification from one of the authorized boards of medical examiners of the state. The case was heard upon an agreed statement of facts, which contained the following recitals:

"The method of treatment by the practitioners of osteopathy is a system of manipulation of the limbs and body of the patient with the hands, by kneading, rubbing or pressing upon the parts of the body. In the treatment, no drug, medicine or other substance is administered or applied, either internally or externally; nor is the knife used or any form of surgery resorted to in the treatment. The practitioner himself performs the manipulations. The teaching and theory of those skilled in osteopathy are, that it is a system of treatment of disease by adjustment of all the parts of the body mechanically. It is taught that any minute or gross derangement of bony parts; contracting and hardening of muscles or other tissues; or other mechanical derangements of the anatomical parts of the body which must be in perfect order mechanically, in order that it may perform its function aright, nerve centers, arteries, veins and lymphatics, which must function properly in order that health may be maintained. It is taught that such interferences lend to congestion, obstructed circulation of blood and lymph, irritation of nerves and abnormal state of nerve centers; that the result is disease which can be cured only by righting what is mechanically wrong. . . . The essential things taught in the schools of osteopathy are anatomy, physiology, hygiene, histology, pathology and the treatment of diseases by manipulation. The repudiation of drugs and medicine in the treatment of diseases is a basic principle of osteopathy and a knowledge of drugs or medicines, their administration for the cure of diseases, the writing and giving of prescriptions, are not essential to the graduation of, and the issuance of diplomas to, students of osteopathy."

When tested by the foregoing definitions, it is manifest that the practice of osteopathy, as it was originally understood and as it was understood at the time of the enactment of our medical act, did not sanction the internal administration of medicines or the surgical use of the knife as a means for curing diseases. As founded, its principal tenet was the abandonment of these means of cure. A perusal of the successive catalogues of its schools will show that their teachings are gradually being expanded, and that the more modern of them now teach in some degree much that is taught in the older schools of medicine. The parent school has been more marked in this respect than perhaps any of them. It now teaches that in "childbirth lacerations," in "certain types of congenital deformities, certain kinds of tumors, etc., surgery must step in," and that surgery must be resorted to for the removal of tissues so badly diseased or degenerated that regeneration is impossible by the process of adjustment. But this advance is modern. It was not in vogue even so late as 1909, the time of the enactment of our medical act. Moreover, it is not yet taught in the school of which the appellant is a graduate. The quotation we have made from the catalogue of the College of Osteopathic Physicians and Surgeons, of Los Angeles, California, is taken from the issue of 1914-1915. It will be observed from its perusal that this particular school still regards the internal administration of drugs as the administration of poison, and the surgical resort to the knife as unnecessary; at least, we take this to be the meaning of the assertions that the osteopathic physician "knows too much about physiology to administer a cause of more disease in the form of a poison," and "takes out none of the pieces of which the human body—that most wonderful of all machines—is composed." But if all of the osteopathic colleges were now teaching the administration of medicines and the resort to surgery by the knife as a means of curing diseases, it would not aid the appellant. His right is to practice osteopathy as that practice was understood at the time the

medical act was adopted, and this we conclude did not sanction the practice resorted to by him in the treatment of the patient mentioned in the information.

The appellant cites cases from this court and cases from the courts of many other of the states holding that the practice of osteopathy is the practice of medicine and surgery within the meaning of the medical acts prohibiting the practice of medicine and surgery without a certificate or license so to do from the proper state authorities. But the principle of these cases we cannot think has any bearing on the question here involved. The purpose of osteopathy is to heal the sick, and it is not denied that the treatment it affords, even in its most restricted use, falls within the generic meaning of the terms "medicine and surgery." But the question here is not this. It is much more narrow. It is, rather, did the appellant's certificate of practice authorize him to resort to the form of treatment he resorted to in the particular instance. It is our conclusion that it did not.

The judgment is affirmed.

MORRIS, C. J., MOUNT, and ELLIS, JJ., concur.