[No. 14913.   Department Two.   August 27, 1918.]

THE STATE OF WASHINGTON, *on the Relation of J. S. McBride, Plaintiff,* v. THE SUPERIOR COURT FOR KING COUNTY, *Respondent.*[1]

HABEAS CORPUS—DEFENSES—QUARANTINE.   It is no defense to habeas corpus proceedings to produce a person detained in quarantine by authority of the state board of health, that the commissioner cannot break quarantine without incurring the penalties of the law, as the order of the court would be a complete protection.

HEALTH—HEALTH ORDINANCES—POWER OF CITY.   Notwithstanding Const., art. 20, § 1, provides that the state board of health be created and makes no provision for city boards, a city has power to pass health ordinances and ·to create the office of health commissioner, when .not in conflict with the general law.

SAME—HEALTH ORDINANCES—VALIDITY.   Seattle ordinances, Nos. 15,957 and 32,444, providing for quarantine of persons afflicted with contagious diseases, with the right of appeal to the state board of health, does not conflict with general laws; for if sole power is conferred upon the state board, the same is preserved by providing the right of appeal.

HEALTH—QUARANTINE — POLICE POWER — AUTHORITY OF BOARDS— REVIEW BY COURTS—HABEAS CORPUS.   The legislature, in the exercise of the police power, has power, by Rem. Code, § 5404 *et seq.*, to create a board of health and to provide that its decisions as to the detention of persons in quarantine shall be final and conclusive; and the courts will not, in habeas corpus proceedings, inquire into the reasonableness of the act, where the legislature makes proper classifications and provides the means and methods for carrying out an ordinance sounding in the police power, the court not going beyond the query whether the subject-matter of the act is within the range of its authority.

CONSTITUTIONAL LAW — DELEGATION OF LEGISLATIVE POWERS — HEALTH LAWS.   Health ordinances relating to quarantine are not unconstitutional as ·an unlawful delegation of legislative authority because they leave to health boards definitions and classifications of disease.

EVIDENCE—JUDICIAL NOTICE—HEALTH LAWS.   The courts may take notice that the nature of contagious diseases are factors to be con-

[1]Reported in 174 Pac. 973.

sidered in the matter of quarantine and to be left to the judgment of medical experts.

HEALTH—QUARANTINE—VALIDITY.· The power· of ·summary quarantine is not to be denied because the authority may be abused or the law maladministered.

HEALTH—STATUTES—CONSTRUCTION.   Health and quarantine laws are to· be liberally. construed.

Application filed in the supreme court July 23, 1918, to prohibit the superior court for King county from releasing on habeas corpus a person detained in quarantine by order of the boards of health of the city of Seattle and of the state of Washington.   Granted.

*Hugh M. Caldwell, Thomas J. L. Kennedy, Walter F. Meier,* and *Geo. A. Meagher,* for relator.

*Smith, Chester, Brown & Worthington,* for respondent.

*The Attorney General,* and *John A. Homer, Assistant, amici curiae.*

CHADWICK, J.—This case grows out of and demands a construction of the quarantine regulations of the city of Seattle and the state law creating a state board of health and defining its powers and duties.

On the 11th day of April, 1918, one Francis Williams was arrested charged with a violation of Ordinance No. 16,046 of the city of Seattle.   On the 14th day of April, Williams was given over to the health commissioner of the city for examination.   The health commissioner found Williams to be afflicted with a dangerous, infectious and contagious disease known as syphilis, whereupon he was committed to the isolation hospital of the city and he has there since remained.

He appealed to the state board of health, and the finding of the commissioner was affirmed.   On July 15th, Williams petitioned this court for a writ of

habeas corpus, alleging that he was arrested, as he believes, without a warrant and without being informed against, and that he is being held on a pretended claim vexatiously instigated by some police officer that he is afflicted with some dangerous, contagious and infectious disease; that such charge is unfounded and in fact untrue; that he is not now, nor at any time during his detention has been, so affected; that, as he believes, the alleged cause of his detention is but a subterfuge in furtherance of a conspiracy on the part of the police department, aided and acquiesced in by the health department, to unjustly deprive him of his liberty; that he has been detained in unsanitary, filthy and poorly ventilated quarters crowded with inmates who are suffering from various ailments, and is forced to use the same soap and a common drinking cup; that he is fed on unwholesome food and forced to submit to arbitrary medical treatment in furtherance of the design to detain him, without the privilege of having or consulting a physician of his own selection.

Upon this showing we ordered that a writ issue returnable on the 17th day of July to the superior court of King county for inquiry as to the time and cause of the detention of the petitioner.

The matter coming on for hearing, the petitioner asked that physicians be appointed to examine him. Superior Judge Tallman, before whom the case was called, appointed three physicians to examine the petitioner. The order was obtained *ex parte* and without formal notice. On the next day the city attorney petitioned Judge Dykeman, Judge Tallman then being out of the city, to vacate the order as improvidently made, contrary to the law, and without sustaining jurisdiction. Judge Dykeman having announced his intention of enforcing the order made by Judge Tallman, the health commissioner came to this court and procured

an order to show cause why a writ of prohibition should not issue restraining further proceedings. We understand that all questions of procedure are waived, to the end that the issues hereinafter to be noted may be finally determined by this court.

It is alleged that Williams was arrested and is detained as a disorderly person under the provisions of Ordinance No. 16,046, "an ordinance for the preservation of the public morality, peace, safety and good order of the city of Seattle, etc."

That he is now held under the provisions of Ordinance No. 15,957 and Ordinance No. 32,444. In the latter ordinance it is provided that:

"Whereas, by reason of investigations made by the Sanitation Department and under its direction, the public welfare requires the examination of persons of both sexes taken into custody by the Police Department of the city for the purpose of preventing the spread of infectious and contagious diseases; now, therefore,

"Be it ordained by the city of Seattle as follows:

"Section 1. For the purpose of preventing the spread of contagious and infectious diseases or maladies, it shall be the duty of the Sanitation Department of the City of Seattle to duly examine in such manner and by such methods as modern science has found to be proper all persons who are taken into custody by the Police Department of the city, who are suspected of being afflicted with any contagious or infectious disease or malady, and the Sanitation Department and the Commissioner of Health are hereby authorized and empowered, and it shall be their duty, to order any such persons so taken into custody to be examined for such purpose."

Ordinance No. 37,928, amendatory of Ordinance No. 15,957, provides:

"Section 6. Whenever it shall come to the knowledge of the Commissioner of Health of the City of

Seattle that any adult therein has chickenpox, or any person therein has smallpox, varioloid, syphilis, gonorrhoea, or any other contagious or infectious disease of a similar or different kind from that herein specified, or any disease or sickness dangerous to the public health, said Commissioner is hereby authorized and empowered, and it shall be his duty to forthwith, whenever in his judgment it is safe, expedient and practicable, cause such infected person to be removed to and kept in a hospital, sanitarium, a separate house, or such place as may be designated by the Commissioner of Health, or as may be by law or ordinance provided therefor, and cause said person to be properly treated and cared for, and to make such other rules and regulations as may be necessary or advisable for the protection of the public health.''

Then follows, *inter alia,* a legislative assertion of existing local conditions calling for the exercise of the police power.

Sec. 1, art 20, of the state constitution provides that ''There shall be established by law a state board of health . . . with such powers as the legislature may direct.''

It is also provided, § 11, art. 11, that ''any county, city, town or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with the general laws.'' The legislature in obedience to the warrant of the constitution has passed general laws creating a state board of health and defining its duties. The law seems to have been drawn upon the theory that the municipalities would exercise their power to enact such measures as they saw fit to care for, protect, and preserve the public health. That such thought prevailed is evidenced by reference to § 7507, wherein the general powers of cities of the first class are enumerated. Power is granted ''To erect and establish hos-

pitals and pesthouses, and to control and regulate the same." (Subd. 17.)

"To restrain and provide for the punishment of vagrants, mendicants, prostitutes, and other disorderly persons;

"To provide for the punishment of all disorderly conduct, and of all practices dangerous to public health or safety, and to make all regulations necessary for the preservation of public morality, health, peace, and good order within its limits, and to provide for the arrest, trial and punishment of all persons charged with violating any of the ordinances of said city; but such punishment shall in no case exceed the punishment provided by the laws of the state for misdemeanors." (Subds. 35, 36.)

In the act creating the state board of health, it is provided:

"The state board of health shall have supervision of all matters relating to the preservation of the life and health of the people of the state. The board shall have *supreme* authority in matters of quarantine, and may declare and enforce it when none exists, may modify, relax or abolish it when it has been established. The board may have special or standing orders or regulations for the prevention of the spread of contagious or infectious diseases, . . . It shall be the duty of all local boards of health, health authorities and officials, officers of the state institutions, police officers, sheriffs, constables, and all other officers and employees of the state, or any county, city or township thereof, to enforce such quarantine and sanitary rules and regulations as may be adopted by the state board of health, and in the event of failure or refusal on the part of any member of said boards or other officials, or persons in this section mentioned to so act, he or they shall be subject to a fine of not less than fifty dollars, upon first conviction, and upon conviction of second offense of not less than one hundred dollars." Rem. Code, § 5406.

"In case of the question arising as to whether or not any person is affected or is sick with a dangerous,

contagious or infectious disease, the opinion of the health officer shall prevail until the state board of health can be notified, and then the opinion of the executive officer of the state board of health, or any member or physician he may appoint to examine such case, shall be final." Rem. Code, § 5546.

"The term 'dangerous, contagious or infectious disease,' as used in this act shall be construed and understood to mean such disease or diseases as the state board of health shall designate as contagious or infectious and dangerous to the public health." Rem. Code, § 5547.

There are two questions discussed by counsel that may be summarily disposed of; the first being that the commissioner cannot obey the order of the court and bring his ward into the presence of the physicians appointed to examine him or into court without subjecting himself to the penalties of the law, and for that reason the writ of habeas corpus will not issue. The law contemplates no such absurdity. If the court has jurisdiction to inquire into the cause of his detention, resort to examination and expert opinion by those skilled in the diagnosis of disease would not be a breaking of the quarantine. The law is not aimed at such situations. The order of the court would be a complete defense. *State ex rel. O'Bannon v. Cole,* 220 Mo. 697, 119 S. W. 424, 22 L. R. A. (N. S.) 990.

The other proposition is that the city has no authority to pass health ordinances or to create the office of health commissioner. It is true that the constitution provides that a state board of health shall be created and makes no provision in terms for the establishment of city boards of health; but a city has general power, both by statute and at common law, to enact all necessary police regulations for the preservation of the morals and health of its inhabitants, the only limitation being a contrary provision of the general law.

We find no conflict between the general law and the city ordinances, they seem to have been drawn with careful regard to the harmonious working out of the problems of public health. *State ex rel. Rose v. Hindley,* 67 Wash. 240, 121 Pac. 447. For, if there be sole power in the state board, that power is satisfied by the preservation of a right of appeal to the state board. The order then becomes the act of the state board, for we cannot concern ourselves with the methods provided by law for the exercise of a jurisdiction founded in the constitution.

This case really presents all the features of a return to the petition for a writ of habeas corpus, and we shall treat it as such and shall refer to Williams as the petitioner and the health commissioner as the relator.

It is the contention of the petitioner that to deny him a review of the findings of the health officers is to suspend the writ of habeas corpus; that the boards of health are not immune to judicial review and that their actions and findings are open to judicial inquiry the same as other boards, institutions and officers. "Their determinations are not final and conclusive; if they were, then the exercise of such summary power could not be upheld." Bailey, Habeas Corpus, § 106; *People ex rel. Copcutt v. Board of Health of Yonkers,* 140 N. Y. 1, 35 N. E. 320, 37 Am. St. 522, 23 L. R. A. 481. And counsel undertakes to fix a boundary line beyond which the state cannot arbitrarily extend the police power. It is, "The legislature may not under guise of police regulation arbitrarily invade personal rights—when those rights are involved it becomes the duty of the court to inquire into it." Relator on the other hand takes the position that it is not only within the power of the legislature to provide that the findings of the state board of health shall be final, but

that, it having done so, the courts cannot under the pretense of a habeas corpus proceeding sit in review of its findings.

This then is the controlling question—Whether the legislature has power to create a board of health and make its rulings final and conclusive when called in question in a court of general jurisdiction.

In *People ex rel. Copcutt v. Board of Health, supra,* it is maintained that an attempt to make a finding of the board conclusive (the law did not make it so) would violate the constitutional right of the one detained. In the case of *In re Smith,* 146 N. Y. 68, 40 N. E. 497, 48 Am. St. 769, 28 L. R. A. 820, while granting the power of the legislature to provide summary methods for the suppression and control of disease, it is strongly insinuated that the acts of the board cannot be upheld, unless a state of facts is shown that will warrant the restraint, otherwise a writ will issue. But it seems to us that these cases are not controlling. They were rightly decided upon the law of the case, but their insinuations are not to be sustained.

A writ of habeas corpus is a writ of right, and is never to be denied in any case where the liberty of the subject is made the subject of inquiry. But it has always been held that a return showing a legal cause for the detention of a petitioner is enough to suspend the operation of the writ. The power to detain one who is suspected of having a contagious disease rests in the police power, and to this extent the authority of the commissioner is not challenged, but the right to restrain a subject without judicial review is vehemently denied.

"The police power is to the public what the law of necessity is to the individual." *State v. Mountain*

*Timber Co.,* 75 Wash. 581, 135 Pac. 645, L. R. A. 1917D 10.

"Private rights must be deemed to be subordinate to the general interest of the public . . . And in respect of personal right every citizen is bound to conform his conduct and the pursuit of his calling to such general rules as are adopted by society, from time to time, for the common welfare." Parker and Worthington, Public Health and Safety, § 12.

"The state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests." McGehee, Due Process of Law, 301.

See, also, *Manigault v. Springs,* 199 U. S. 473; *State v. Somerville,* 67 Wash. 638, 122 Pac. 324.

And since *Barbier v. Connolly,* 113 U. S. 31, it has been held that the limitations of the Fourteenth Amendment were not intended to interfere with the exercise of the police power on the part of the state.

"Nor can it justly be said that the proceedings of the authorities, with respect to the special orders mentioned, do not constitute 'due process of law,' or that they violate 'the law of the land' for any of the following reasons, namely:

"(1) That the functions of accuser and judge are blended in the same body; (2) That no process is served, or notice of the proceedings given to the parties interested; (3) That the judgment precedes the trial; (4) That the accused is not confronted with the witnesses against him; (5) That the testimony is not under oath; nor the ordinary rules of evidence observed; or (6) That no means are afforded to the accused to compel the attendance of witnesses." Parker and Worthington, Public Health and Safety, § 88.

See, also, *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466.

If the legislature makes proper classification or prescribes methods, the reasonableness of its acts must rest in the nature of the subject treated.

"The test of reasonableness is applicable alike to the statutes of the legislature passed in the exercise of the police power and to the acts of local municipal legislative bodies acting under powers delegated by the legislature. The English courts have from time immemorial applied the test to municipal legislation, and our courts assume a much more untrammelled attitude in examining the reasonableness of municipal ordinances. Yet every intendment is to be made in favor of the lawfulness of the exercise of municipal power making regulations to promote the public health and safety, and it is not the province of courts, except in clear cases, to interfere with the exercise of the power reposed by law in municipal corporations for the protection of local rights and the health and welfare of the people in the community." McGehee, Due Process of Law, page 308.

In testing the reasonableness of an ordinance or legislative conduct sounding in the police power, the courts have not been inclined to go beyond the query, whether the subject-matter of the act is within the range of its authority, and having so determined they will not revise, correct or nullify the methods and means employed to accomplish the purpose of the law. That the preservation of the public health is a proper subject for the exercise of the police power goes without saying; indeed, it is the first concern of the state.

"The discussion of modern police regulations has revealed the tendency of judicial and public opinion to translate the maxim, *salus populi suprema lex;* the public health is the highest law; and whenever a police regulation. is reasonably demonstrated to be a promoter of public health, all constitutionally guaranteed rights must give way, to be sacrificed without compensation to the owner." Tiedeman, State and Federal Control of Persons and Property, § 169.

Indeed, it may be said that, where the police power is set in motion in its proper sphere, the courts have no jurisdiction to stay the arm of the legislative branch of the government, for it is operating in its own particular field, where even the courts are powerless to insist upon a procedure consistent with the forms of the common law. Some courts have held that the discretion and judgment of administrative officers, while very broad, is not absolutely and in all cases beyond judicial control, but the tendency is away from this doctrine, for, granting the right to question means and methods in one case, the questions of fact upon which the administrative order is based might be raised in every case, and the object of the law, which is to deal summarily, to the end that imminent peril to the public may be averted, would be wholly overcome. At any rate, a somewhat extended exploration of the books convinces the writer that a court should not inquire into the reasonableness of an ordinance sounding in the police power in any case where the legislative body has provided the means and methods of carrying it into effect.

That a city council may pass ordinances under its general powers to promote and preserve the public health, even to the extent of doing that which would be rejected as unreasonable if passed under its authority to legislate with reference to corporate affairs, is affirmed, as we read the text, by Judge Dillon.

"In other words, what the legislature distinctly says may be done cannot be set aside by the courts because they may deem it to be unreasonable or against sound policy. But where the power to legislate on a given subject is conferred, and the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid." Dillon, Municipal Corporations (5th ed.), par. 600.

And the author, in commenting on the case of *Ex parte Vance,* 42 Tex. Cr. 619, 62 S. W. 568, credits it with approval of the text just quoted, and "as holding that the court may pass upon the reasonableness of an ordinance passed in pursuance of an express grant of power from the legislature where the mode of the exercise of the power is not prescribed, or the legislature has not acted directly on the subject."

The Federal government has, in the exercise of its sovereignty and for many years, assumed to hold immigrants for examination and possible quarantine. Under the Federal statutes and the regulation of the department, the executive officers are given a discretionary power to determine the right of an immigrant to land. There may be an appeal to the secretary having charge of immigration affairs. It is provided that his decision shall be final. In *Nishimura Ekiu v. United States,* 142 U. S. 651, the supreme court denied a writ of habeas corpus. It was contended that the law giving the immigration officers exclusive authority to determine the right of a party to land was so far unconstitutional as to deprive the petitioner of her liberty without due process of law.

"Congress may, if it sees fit, as in the statutes in question, in *United States v. Jung Ah Lung,* just cited [124 U. S. 621], authorize the courts to investigate and ascertain the facts on which the right to land depends. But, on the other hand, the final determination of those facts may be entrusted by Congress to executive officers; and in such a case, as in all others, in which a statute gives a discretionary power to an officer, to be exercised by him upon his own opinion of certain facts, he is made the sole and exclusive judge of the existence of those facts, and no other tribunal, unless expressly authorized by law to do so, is at liberty to reexamine or controvert the sufficiency of the evidence on which he acted. *Martin v. Mott,* 12 Wheat. 19, 31;

*Philadelphia & Trenton Railroad v. Stimpson,* 14 Pet. 448, 458; *Benson v. McMahon,* 127 U. S. 457; *In re Oteiza,* 136 U. S. 330. It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law. . . .

"The decision of the inspector of immigration being in conformity with the act of 1891, there can be no doubt that it was final and conclusive against the petitioner's right to land in the United States. The words of section 8 are clear to that effect, and were manifestly intended to prevent the question of an alien immigrant's right to land, when once decided adversely by an inspector, acting within the jurisdiction conferred upon him, from being impeached or reviewed, in the courts or otherwise, save only by appeal to the inspector's official superiors, and in accordance with the provisions of the act."

See, also, *United States ex rel. Schleiter v. Williams,* 203 Fed. 292; *United States ex rel. Aronowicz v. Williams,* 204 Fed. 844; *United States v. Gin Fung,* 100 Fed. 389.

In *United States v. Ju Toy,* 198 U. S. 253, the court seems to have removed the doubt, theretofore existing, as to whether the rule of its former decisions would be extended to one who claimed to be a citizen of the United States. The court held the act to apply, "whatever the ground on which the right to enter the country is claimed—as well when it is citizenship as when it is domicile and the belonging to a class excepted from the exclusion acts," and

"But it is not improper to add a few words. The petitioner, although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction and kept there while his right to enter was under debate. If, for the purpose of argument, we assume that the Fifth Amendment applies to him and that to deny entrance to a citizen is to deprive him of liberty, we nevertheless are of opinion that with regard to him due process of law does not require a judicial trial. That is the result of the cases which we have cited and the almost necessary result of the power of Congress to pass exclusion laws. That the decision may be entrusted to an executive officer and that his decision is due process of law was affirmed and explained in *Nishimura Ekiu v. United States,* 142 U. S. 651, 660, and in *Fong Yue Ting v. United States,* 149 U. S. 698, 713, before the authorities to which we already have referred. It is unnecessary to repeat the often quoted remarks of Mr. Justice Curtis, speaking for the whole court in *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 280, to show that the requirement of a judicial trial does not prevail in every case."

It would seem that the analogy of these cases is complete, but, if it be not so it would appear that we have held in principle as we are now holding. In *Davison v. Walla Walla,* 52 Wash. 453, 100 Pac. 981, 132 Am. St. 983, 21 L. R. A. (N. S.) 454, we held that things done under the police power may be done without resort to judicial proceedings, and in *State v. Somerville,* 67 Wash. 638, 122 Pac. 324, we said:

"Many courts have held that a large discretion is necessarily vested in the legislature when exercising that power, and that the legislature may determine not only what the public interest demands, but also what measures are requisite and necessary to secure and protect the same."

And in the concurring opinion by the writer of this opinion:

"Where the facts depend upon proof, I think it is competent for the legislature to pass a labor law covering any particular industry, and that the law will be binding upon the courts regardless of the showing that might be made in any particular case. If it were otherwise, we would have a law for 'special cases,' and we could not depend upon general laws, for the obvious reason that the legislature could not pass a law with any assurance that it would be general in its application."

In *State ex rel. Puyallup v. Superior Court,* 50 Wash. 650, 97 Pac. 778, the uncertainty of the statute was urged against the right of a city council to revoke a liquor license except for a cause sufficient to stand the test of judicial review. It was held:

"It is not authority to regulate under certain circumstances, or to restrain under certain circumstances, but the authority is absolute and unlimited, and it is evident that the legislature intended to refer the whole subject to the city council."

The provision that the finding of the health officers shall be final is a sufficient evidence of legislative intent to leave the whole matter to the health officers without restraint on the part of the courts. The case just cited rested upon, and is sustained by, *State ex rel. Aberdeen v. Superior Court,* 44 Wash. 526, 87 Pac. 818.

We are unable to draw a line that would logically differentiate this case from the principle involved in those cases where the courts have sustained findings of medical and dental boards. If it is within the power of the legislature to provide for the licensing of all those who are skilled in the profession devoted to the health of the people, and to lodge the determination of their qualifications in a board of professional men, it ought to follow that the legislature could provide by a similar law for taking the judgment of men having

the same skill upon a question of fact as to the existence of, or whether a given person was, or is, afflicted with a contagious, dangerous or infectious disease. The right is sustained because the act of such board is in no sense judicial. *State v. Bonham,* 93 Wash. 489, 161 Pac. 377, L. R. A. 1917D 996; *Reetz v. Michigan,* 188 U. S. 505; 30 Cyc. 1550.

The power of the state board to determine the qualification of dentists and physicians has been repeatedly affirmed in this state. *State ex rel. Smith v. Board of Dental Examiners,* 31 Wash. 492, 72 Pac. 110; *Brown v. State,* 59 Wash. 195, 109 Pac. 802; *State ex rel. Brown v. Board of Dental Examiners,* 38 Wash. 325, 80 Pac. 544, where the court said:

"The general rule is well established that the courts cannot review the discretion which has by law been vested exclusively in inferior tribunals."

Our conclusions are not in accord with the text of Bailey, but he is content to rest his conclusions upon the two New York cases referred to in the fore part of this opinion. To follow him would make the exercise of the police power a judicial function. We find nothing in our decisions or in the reasons of the law to sustain such doctrine.

The sustaining grace of the police power being in its inceptions and general application rather than in its consequences as applied to individual cases, we hold that the ordinances of the city of Seattle and the state law are founded in sound reason.

It is finally contended that the law is unconstitutional in that it delegates legislative power to the health boards, in that it leaves to them definitions and classifications of diseases. This court has not heretofore considered similar laws as a delegation of legislative power or authority. The legislation is that of

the legislative body, but it is not always practical to meet every phase of the necessity that has called for the law by the enactment of a general statute.

The legislature may well have taken notice of the fact that the nature, virulency and extent of territory covered by contagious and infectious diseases, whether endemic or epidemic, are all factors to be considered in the matter of quarantine, and that, after all, the whole working of a plan for quarantine must depend upon the judgment and discretion of men learned in the science of medicine, and that doctors sometimes disagree. The legislature, as well as the courts, would be helpless in such matters without resort to expert opinion, and their judgments would necessarily lie in greater or less degree in the facility of witnesses and the skill of counsel. It is most likely that the legislature sought to avoid the confusions and delays that must necessarily follow if arbitrary classifications were attempted in the statute, for if it had the power to say, in emergency —in self-defense—that, inasmuch as the whole matter of quarantine must rest ultimately in the judgment of medical men, it could avoid the danger of partisan opinion and fix the seat of that judgment in men of its own choosing, or to be chosen in a way provided, and who, being bound by oath to perform a public duty, and having a due sense of responsibility, presumably would discharge their office with justice and fidelity. We may well adopt the language of the court in another case:

"Because the state has, as in this instance, determined upon and specified the officers upon whose judgment on the questions submitted to them the state is willing to rely. Taking the case at bar for example, if a record of the examination had been produced in court, with the questions, answers, and credits given to each question, who would determine whether or not a particular answer had received a sufficient credit? Certainly not the jury, for they are not presumably

competent to pass a proper judgment on such subjects. Not the judge, for his qualifications do not embrace, or at least require, an expert knowledge of the science of dentistry. Expert witnesses could not be properly permitted to testify, for the reason that the state has already designated and empowered experts to pass upon these questions presumably by reason of their recognized qualifications." *State ex rel. Brown v. Board of Dental Examiners,* 38 Wash. 325, 80 Pac. 544.

Nor is there any legal reason for denying the power to quarantine summarily, or to restrain for treatment, a citizen or subject because the authority may be abused or the law maladministered in a given case. *Brown v. State,* 59 Wash. 195, 109 Pac. 802; *In re Thompson,* 36 Wash. 377, 78 Pac. 899. It is settled that laws and ordinances creating boards of health and granting wide powers for the effective and effectual carrying out of the legislative plan for protecting health, must be liberally construed. For as Mr. Freund says in his work on Police Power, § 446:

"The detention of persons affected with or suspected of contagious disease in quarantine presents one of the cases where the police power is literally the law of self-protection and paramount necessity."

We must credit the legislature with a consideration of these things.

The state board of health and the health commissioner of the city of Seattle

"Being the agency created by the legislature to prevent the outbreak and spread of disease, and to remove causes of sickness, the presumption is always in favor of the board of health, and its action will not be interfered with unless it appear unreasonable or oppressive. The fact that its membership may sometimes be composed of extremists is no reason for denying the power conferred by the legislature. Nor should we be controlled by the fact that a scientific theory of to-day may be discarded tomorrow. In matters affecting

the public health it is the part of reason and common sense to adopt the best scientific thought of the age in which we live. If research and investigation lead to other accepted theories, then we must adopt them. Were. the rule otherwise, both the courts and the legislature would be without a competent guide." *Board of Health of Covington v. Kollman,* 156 Ky. 351, 160 S. W. 1052, 49 L. R. A. (N. S.) 354.

The rule being that health laws shall be liberally construed, the power of the legislative branch of the government is not to be lightly interfered with or set aside. Courts will not seek for an opportunity to declare a right of appeal or review in cases resting in public necessity.

We find, as the supreme court of New Jersey found in a similar case:

"But upon the general merits of the controversy, we are unable to perceive anything in the legislation referred to conferring upon the Common Pleas the right to review the conditions, and the emergency in the locality, which prompted the board of health to impose the restrictions and quarantine complained of in this case. We are unable to perceive any authority in the legislation itself or in the public policy upon which it is based which can be said to contemplate the submission to a legal tribunal of the public necessity, which requires in an emergency the prompt and expeditious intervention of a board to which the legislature for the protection of life and health, in a community, has especially committed the determination of the facts." *Board of Health v. Union Common Pleas,* 83 N. J. L. 392, 85 Atl. 217;

For, as said in that case, to assume to review a finding of a properly constituted officer vested with authority to determine a fact in a critical situation involving detriment to the life and health of a community is tantamount to a declaration that the police power of the city is moribund and useless.

Finally, we hold that it is within the power of the legislature, in dealing with the problems of public health, to make the determination of a fact by a properly constituted health officer final and binding upon the public as well as upon the courts.

Having so concluded, the writ will issue.

MAIN, C. J., FULLERTON, HOLCOMB, and MOUNT, JJ.. concur.