No. 22,691.

## In re WALTER McGEE, GEORGE ANDREWS, and GEORGE BUCKNER, Petitioners.

### SYLLABUS BY THE COURT.

1. PUBLIC HEALTH—*Statute Relating to Control of Infectious and Communicable Diseases is Constitutional.* Chapter 205 of the Laws of 1917 undertakes to protect public health by preventing dissemination of dangerous communicable diseases, through isolation and quarantine measures, nonobservance of which is declared to be a misdemeanor, and is not unconstitutional on the ground it delegates legislative power, because it confers on the state board of health authority to designate such diseases as are infectious, contagious, or communicable in their nature, and to prescribe proper control measures.

2. SAME—*Isolation of Men Infected with Venereal Disease—Rules of Board of Health—City Ordinance.* Rules of the state board of health, adopted and published pursuant to the statute, and provisions of a city ordinance framed in accordance with the rules of the state board of health, considered, and held not to be unreasonable because they authorize isolation of men infected with venereal disease at an institution provided by the state for isolation and treatment of such diseases.

3. SAME—*Infected Person—Finding of City Health Officer Conclusive.* The finding of a city health officer that a person has been examined and has been found to be infected with a dangerous communicable venereal disease, is conclusive as to the facts found, in the absence of a charge of bad faith, or conduct equivalent to bad faith, on the part of the officer.

4. SAME—*Infected Person Isolated at State Institution—Not Entitled to Writ of Habeas Corpus.* A person regularly ordered to be isolated at the state institution is not entitled to a writ of habeas corpus for his discharge because he is able to provide himself with proper treatment at an isolated place in the locality of his residence.

5. SAME—*Place of Isolation Not Indefinite—Misnomers.* The facts considered, and held that certain misnomers of the state institution, "The State Quarantine Camp for Men, at Lansing," do not render the place of isolation indefinite, or otherwise invalidate the isolation orders under which the petitioners are held.

Original proceeding in habeas corpus. Opinion filed November 18, 1919. Writ denied.

*Elisha Scott,* of Topeka, for the petitioners.

*D. H. Branaman,* city attorney, for the respondents.

*In re* McGee, *Petitioner.*

The opinion of the court was delivered by

. BURCH, J.: The petitioners presented an application for a writ of habeas corpus, to free them from present detention by the chief of police of the city of Topeka, and to forestall execution of an isolation order contemplating further detention. The cause was heard on the application for the writ. ·The isolation order relating to one of the petitioners is in the following form:

"NOVEMBER 10, 1919.

*"The Chief of Police, Topeka, Kansas.*

"SIR—By authority of the rules and regulations for the control and suppression of venereal disease in the state of Kansas, enacted by the Kansas State Board of Health, March 29, 1918, under authority of chapter 205, Session Laws of 1917 (and ordinance No. 4832, city of Topeka), ' I hereby notify you that George Buckner, now in custody at the city jail at Topeka, Kansas, has been examined and found to be infected with a dangerous, communicable disease, viz.: chronic gonorrhœa.

"In further pursuance of said rules and regulations, I hereby designate the state penitentiary at Lansing, Kansas, as the place and limit of the area in which the above-named person is to be isolated.

"I request that you take the necessary action to transfer said person to the state penitentiary in accordance with the above-cited authority.

"Respectfully,

"[Signed]    EARLE G. BROWN, M. D.,

*"City Health Officer."*

Constitutionality of the statute, validity of the rules of the state board of health, and validity of the city ordinance, referred to in the order, are questioned.

Section 1 of the statute, which became effective on · February 28, 1917, reads as follows:

"For the better protection of the public health and for the control of communicable diseases, the State Board of Health shall designate .such diseases as are infectious, contagious or communicable in their nature and the State Board of Health is herewith authorized to make and prescribe rules, regulations and procedures for the isolation and quarantine of such diseases and persons afflicted with or exposed to such diseases as may be necessary to prevent the spread and dissemination of diseases dangerous to the public health. Such rules, regulations and procedures shall be published in the. official state paper, and when so published shall be in full force and effect." (Laws 1917, ch 205.)

Section 2 provides penalties for violating, or refusing or neglecting to obey, any of the rules, regulations or procedures prescribed by the state board of health.

It will be observed the statute is general, and contemplates protection of the public health by control of all dangerous diseases which are infectious, contagious, or communicable. It was not long until specific application of the statute to venereal diseases became urgent, on account of social conditions attending concentration of large bodies of troops at the three United States military establishments in the state, Fort Leavenworth, Fort Riley, and Camp Funston. The state board of health declared syphilis, gonococcus infection, and chancroid to be infectious, contagious, or communicable in their nature, and notifiable diseases dangerous to the public health, and made and published rules and regulations for the control and suppression of such diseases. The rules necessarily involved isolation of diseased persons, and facilities for isolation in the localities where such persons were found were totally inadequate. Desiring to coöperate with the state board of health and with the government of the United States in dealing with the venereal-disease problem, the state board of administration, which is the central body having control of all correctional, charitable, and educational institutions of the state, placed at the disposal of all authorities concerned, the facilities existing on the penitentiary reservation at Lansing. Provision was made for the quarantine and medical treatment of women at the industrial farm for women. Provision was made for the isolation of men in one of the penitentiary buildings, for their treatment at the penitentiary hospital, and for certain liberties outside the walls of the institution in connection with a few hours' work each day on the penitentiary farm. The portions of the state property thus set apart for the use of men were designated "The Kansas State Quarantine Camp for Men, at Lansing," and the portion set apart for the use of women was designated "The Kansas State Quarantine Hospital for Women, at Lansing." Experience demonstrated that the men sent to the quarantine camp thus established were, generally speaking, a bad lot, and the board of administration provided that they should be subject to such rules for the discipline and control of the institution as the warden, with the approval of the board, might adopt.

·The rules and regulations for the control of venereal diseases adopted by the state board of health cover the subject in detail. A portion of rule XXXVI reads as follows:

"SECTION 1. Local county and city health officers throughout the state and deputy state health officers appointed for that purpose are hereby authorized and directed to use every available means to ascertain the existence of and immediately investigate all suspected cases of syphilis in communicable form, gonococcus infection or chancroid within their respective jurisdictions, and to ascertain the source of such infections.

"SEC. 2. In such investigations said local health officers, deputy state health officers, or their duly authorized representatives, are hereby vested with full powers of inspection, examination, isolation and disinfection of all places, persons, and things, and as such inspectors said local health officers, deputy state health officers, or their duly authorized representatives, are hereby authorized:

"(*a*) To make examinations of all persons reasonably suspected of having syphilis in communicable form, gonococcus infection, or chancroid. Owing to the prevalence of such diseases among pimps and prostitutes, all such persons may be considered in the above class.

"(*b*) To isolate such persons whenever in the opinion of said local health officer, deputy state health officer, the State Board of Health or its secretary, isolation is necessary to protect the public health. In establishing isolation the health officer shall define the place and the limits of the area in which the person reasonably suspected or known to have syphilis, gonococcus infection, or chancroid, and his or her attendant, are to be isolated, and no persons, other than the attending physicians, shall enter or leave the area of isolation without the permission of the health officer having jurisdiction. Provided: That women may be quarantined at the Kansas State Quarantine Hospital for Women, at Lansing, and men may be quarantined in the Kansas State Quarantine Camp for Men at Lansing."

In September, 1918, the board of commissioners of the city of Topeka passed an ordinance, No. 4832, dealing with the subject of venereal diseases, which followed closely the rules and regulations of the state board of health. A part of section 8, and sections 9 and 10, read as follows:

"SEC. 8. *Powers and duties of city health officer.*—It is hereby made the duty of the city health officer and he is hereby directed and empowered: (*a*) To make examinations of persons reasonably suspected of having syphilis in the infectious stages, or gonococcus infection. Owing to the prevalence of such diseases among prostitutes, all prostitutes may be considered within the above class. (*b*) To isolate persons infected with any of said diseases whenever isolation is necessary to protect the public health. In establishing isolation, the city health officer shall define the limits of the area in which the persons reasonably suspected or

known to have syphilis or gonococcus infection and his or her immediate attendant are to be isolated, and no person other than the attending physician shall enter or leave the area of isolation without the permission of the city health officer. . . .

"Sec 9. *Detention hospital.*—It shall be the duty of the city health officer to use only such building or buildings for quarantine purposes under this ordinance as shall first be provided or accepted by the board of commissioners; provided, however, that the State Industrial Farm for Women, at Leavenworth, may be used for such quarantine purposes.

"Sec. 10. *Quarantine.*—Whenever it is necessary for the protection, of the public health that persons infected with venereal diseases be quarantined, the city health officer shall quarantine such diseased person[s] in said detention hospitals or at said industrial farm, and cause to be administered to such persons a proper course of treatment."

In May, 1919, the board of commissioners adopted a resolution reciting that the city had no suitable place to isolate and treat persons afflicted with venereal diseases, and designated and accepted as such places the "farm for interned men at Lansing," for men, and the "state industrial farm for women," for women.

The statute is assailed as delegating legislative power to the state board of health. The statute belongs to the well-known class in which the legislature enacts a law in general terms, confers on an officer or administrative body power to enforce the law, and, to accomplish that end, to adopt necessary rules and regulations, and prescribes penalties for violations of the regulations so adopted (12 C. J. 844, 848). The necessity for legislation of this character is demonstrated by very recent events. If, when the statute under consideration was before the legislature, it had designated all the infectious, contagious, and communicable diseases it knew, and had prescribed regulations for their suppression and control, it would have omitted the deadly influenza which soon afterwards made such appalling inroads on the lives and health of the people of the state. To meet emergencies of this character it is indispensable to preservation of the public health that some administrative officer or board should be clothed with authority to make adequate rules which have the force of law, and generally the public welfare is best promoted by delegating power to make administrative regulations to fulfill the expressed intention of the legislature. While in this instance the terms of the statute are somewhat meager, it undertakes to protect public

*In re* McGee, *Petitioner.*

health by preventing dissemination of dangerous communicable diseases, through isolation and quarantine measures, nonobservance of which is declared to be a misdemeanor; and the authority given the state board of health to specify such diseases as measure up to the standard of infectious, contagious. and communicable, and to prescribe appropriate control measures, is well sustained. The following cases, chosen from a constantly lengthening list, discuss and apply the principles involved: *Isenhour v. State,* 157 Ind. 517—authority to state board of health to adopt measures necessary to facilitate enforcement of pure-food law, and to define specific adulterations (milk); *Red "C" Oil Co. v. North Carolina,* 222 U. S. 380—authority of state board of agriculture to determine. what oils are safe, pure, and afford sufficient light; *Carstens v. DeSellem,* 82 Wash. 643—authority of commissioner of agriculture to specify diseases and pests injurious to nursery stock, trees, etc.; *Buttfield v. Stranahan,* 192 U. S. 470—authority of secretary of treasury, on recommendation of board of experts, to establish standards of tea; *St. Louis & Iron Mountain Ry. v. Taylor,* 210 U. S. 281—authority of interstate commerce commission, in conjunction with American railway association, to designate and promulgate standard height and maximum variation of freight-car draw bars; and *Richards v. Coal Co.,* 104 Kan. 330, 179 Pac. 380—rules and regulations relating to use of dynamite and other detonating explosives in mines, agreed on between employer and employees and approved by state mine inspector.

In the case of *The State v. Crawford,* 104 Kan. 141, 177 Pac. 360, it was held that the principles under discussion could not be extended to validate a code of rules relating to electric wiring, promulgated and revised from time to time by a body composed of private individuals and voluntary unofficial organizations, which meets occasionally somewhere in the United States.

The rules of the state board of health and the city ordinance are assailed as unreasonable. In this instance only those provisions of the rules of the state board of health and of the city ordinance are involved which relate to isolation of persons who have been examined and have been found to be dis-

eased. Reasonableness of provisions relating to discovery and to examination of suspects need not be determined. It may be observed, however, that while provisions of the latter class cut deeply into private personal right, the subject is one respecting which a mincing policy is not to be tolerated. It affects the public health so intimately and so insidiously that considerations of delicacy and privacy may not be permitted to thwart measures necessary to avert the public peril. Only those invasions of personal privacy are unlawful which are unreasonable, and reasonableness is always relative to gravity of the occasion. Opportunity for abuse of power is no greater than in other fields of governmental activity, and misconduct in the execution of official authority is not to be presumed.

It is urged that the regulations in question are unreasonable, in that they authorize isolation in remote places beyond the limits of the city in which the petitioners reside. The court knows of no law or rule of public policy or private right which requires a person who, for the protection of the public, must be isolated and treated for loathsome communicable disease, to be interned in the locality in which he may reside. It would have been competent for the state board of health to designate a single hospital for the detention of all persons in the state found to be so diseased, and it is entirely reasonable for cities having inadequate facilities, or having no facilities of their own, to take advantage of those provided by state authority. In this instance the city health officer's power to isolate is restrained by ordinance which requires the city commission to approve detention hospitals other than those provided by the city.

In the application for the writ it is stated that the petitioners are not diseased. The question is one of fact, determinable by practically infallible scientific methods. The city health officer was authorized to ascertain the fact. He has certified to the existence of disease, and, in the absence of a charge of bad faith, or conduct equivalent to bad faith, on his part, his finding is conclusive.

In the application for the writ it is stated that, if the petitioners be diseased, they are able to provide themselves with proper treatment in an isolated place in the city of Topeka.

The answer is, the public health authorities are not obliged to take chances.

Finally, it is said that the isolation orders are bad because they direct quarantine in the state penitentiary, and the petitioners may not be confined in the penitentiary for disease. The orders ought not to have used the term "state penitentiary," and should be amended by employing the official designation, "The State Quarantine Camp for Men, at Lansing." While it is true that physical facilities constituting part of the penitentiary equipment are utilized, interned persons are in no sense confined in the penitentiary, and are not subject to the peculiar obloquy which attends such confinement. Since, however, the isolation orders specify the authority under which they are issued, there is no doubt about the place. Neither is there any doubt that the place is the identical place approved by the city commissioners under the name "Farm for Interned Men at Lansing." Consequently, the confusion and misapplication of names, which should be avoided in the future, are not sufficient to entitle the petitioners to discharge.

The writ is denied.