ROCK *v.* CARNEY.

1. PUBLIC HEALTH—RULES AND REGULATIONS—REASONABLENESS— JUDICIAL QUESTION.

> While the power to protect the public health is vested by law in public health boards, the legality and reasonableness of the rules and regulations through which this power is exercised constitute judicial questions beyond the power of the legislature to foreclose.

2. SAME—COMMUNICABLE DISEASES—CLASSIFICATION—POWERS OF STATE BOARD OF HEALTH—QUESTIONS REVIEWABLE.

> While the classification of a disease as dangerous and communicable by the State board of health under 1 Comp. Laws 1915, § 5018, may not be reviewed by the courts, the method adopted to prevent the spread thereof is open to judicial inquiry when a claimed unlawful exercise of authority has been visited upon a citizen and redress is asked.

3. SAME—EXAMINATIONS FOR COMMUNICABLE DISEASES—REASONABLE GROUNDS.

> The power of a public health officer to make physical examinations of persons to determine the presence of communicable diseases, under 3 Comp. Laws 1915, § 5091, may not be exercised indiscriminately, but only in good faith and upon reasonable ground to believe that the person examined is infected.

4. SAME—COMMITMENT OF INFECTED PERSON TO DETENTION HOSPITAL—POWER OF HEALTH OFFICER.

> In the absence of statutory authority, a public health officer has no power to refuse a person infected with a communicable disease isolation in the home by quarantine and placard notice thereof and to commit the diseased person to a hospital.

5. SAME—RESTRAINT OF LIBERTY—JUSTIFICATION—VENEREAL DISEASE—EVIDENCE—BURDEN OF PROOF.

> In an action against a city health officer, who was also an inspector for the State board of health, for damages for the alleged unlawful detention of plaintiff in a hospital for treatment for venereal disease, where the detention

On general delegation of power to guard against spread of contagious disease, see note in 8 A. L. R. 836.

On compulsory examination for venereal disease see note in 2 A. L. R. 1332.

On right of one detained pursuant to quarantine to habeas corpus, see note in 2 A. L. R. 1542.

was made to appear, the burden was upon defendant to justify the same.

6. SAME—EVIDENCE—DIRECTED VERDICT.

In said action, where defendant offered no evidence tending to justify his conduct, the trial court was in error in directing a verdict in favor of defendant.

Error to Gratiot; Moinet (Edward J.), J. Submitted June 23, 1921. (Docket No. 17.) Decided December 21, 1921.

Case by Nina McCall Rock, an infant, by her next friend, against Thomas J. Carney and others for the unlawful restraint of plaintiff's liberty in a detention hospital for treatment. Judgment for defendants on a directed verdict. Plaintiff brings error. Reversed.

*Brown & Kelley* and *S. H. Person*, for appellant.

*O. L. Smith* and *James G. Kress* (*Cummins & Nichols*, of counsel), for appellees.

FELLOWS, J. Plaintiff at the time the events occurred which are the basis of this lawsuit in 1918 was 18 years of age. She lived with her mother at St. Louis about 3 miles from Alma. Defendant Carney is a physician residing at Alma and was at that time health officer of that city and had also been appointed an inspector by the State board of health. There was at this time a considerable number of soldiers stationed at Alma and the State board of health together with local health boards and officers were at this time engaged in the work of eradicating and preventing the spread of venereal diseases especially among soldiers. Defendant Ida B. Peck was a nurse and social worker employed by the city of Alma and the school board of that city to aid in this work. Defendant Mary Corrigan was superintendent of a hospital at Bay City where girls and women are de-

tained and treated for such diseases. This hospital had a contract with the State board of health to care for female patients thus afflicted. As the trial judge directed a verdict for defendants the testimony most favorable to plaintiff must be accepted. This testimony tended to establish the following state of facts: Plaintiff was approached by a Mr. Martin, a deputy sheriff. What he said to her was excluded, but as a result of their conversation she and her mother accompanied Mr. Martin to the office of Dr. Carney in Alma where the doctor in the presence of her mother and a lady nurse made a physical examination of her person. It is her claim that this was without her consent although no force was used or any assault committed other than that necessary to make the examination. He informed them that she was diseased, that she had gonorrhea and would have to go to Bay City. He also told them she would have to go to Bay City or their home would be placarded showing the presence of venereal disease. She claims that later he told her she would have to go to Bay City and that he would not consent to her remaining at home and placarding the house. Plaintiff signed two papers in which she consented to go to the Bay City hospital and accept treatment and agreed to follow the rules and regulations of the institution. It is her claim that she signed them without knowledge of their contents. Dr. Carney executed a certificate showing that she was afflicted with gonorrhea and this certificate together with the two papers signed by her were given to defendant Peck who took plaintiff to the Bay City hospital and delivered to defendant Corrigan the papers intrusted to her. Shortly after plaintiff was received at the hospital blood was extracted for examination, for a Wasserman test; its examination disclosed positive results indicating syphilis, and she was treated for both gonorrhea and syphilis for about

twelve weeks, and at the end of that time she was discharged from the institution, having been found free from the diseases in thei infectious stage. She claims that upon the insistence of defendant Peck she went to Dr. Carney after she returned home and received further treatments. She brings this action to recover the damages she claims to have suffered through the various acts of these defendants who she claims were acting in concert, and it is the claim of her counsel that each and all of the acts of defendants were without statutory authority and that they infringed the constitutional rights of this plaintiff.

The questions involved in this litigation are of supreme importance, not only to the individuals composing this commonwealth, but also to the numerous boards of health and to the State itself. We approach their consideration with a due regard of their importance. Neither a desire to sustain the State, nor a supersensitiveness prompted by the delicacy of the examination here involved should in any way enter into or control our decision. Policies adopted by the legislative and executive branches of the State government are not submitted to this branch for approval as to their wisdom. They stand or fall in this court because valid or invalid under the law, and their wisdom or want of wisdom in no way rests with us. If valid they must be upheld by this court; if invalid they must be so declared by this court. If these defendants have transcended their power they must be held liable, and they may not be excused from liability by the fact that their motives were of the highest. If they have not transcended their power they are not liable, and supersensitiveness or preconceived notions of proprieties no matter of how long standing do not render them liable. The case must be determined by the application of cold rules of law.

In section 5018, 1 Comp. Laws 1915, it is provided:

"The said State board of health is hereby expressly authorized to designate what diseases are dangerous communicable diseases and what diseases are contagious diseases, and it shall be the duty of every local board of health and health officer to observe such rules in relation to dangerous communicable diseases and contagious diseases as may be prescribed by the said State board of health."

Acting pursuant to the authority here conferred the State board of health designated gonorrhea and syphilis as dangerous communicable diseases. The validity of the provision of the statute above quoted is here assailed by plaintiff's counsel as a delegation of legislative power and it is claimed that it contravenes sections 1 and 2 of article 4 of the Constitution of the State. We cannot follow plaintiff's counsel in this contention. This is not an attempt on the part of the legislature to delegate to a board or commission the power to make a law but is the delegation to a board of the power to find a fact, a scientific fact, a medical fact. This distinction was clearly pointed out in *Locke's Appeal*, 72 Pa. St. 491, 498 (13 Am. Rep. 716), where it was said:

"Then, the true distinction, I conceive, is this: The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government."

It is now too late to insist that the power given to administrative boards, commissions and officers to determine questions of fact and to make proper administrative rules and regulations is the delegation of legislative or judicial power. Much of recent legislation of this character has been assailed on this ground and with striking unanimity the courts have rejected the contention. See *Kennedy* v. *State Board of Registration*, 145 Mich. 241; *Michigan Cent. R. Co.*

v. *Railroad Commission,* 160 Mich. 355; *Feek* v. *Bloomingdale Township Board,* 82 Mich. 393 (10 L. R. A. 69) ; *Sherlock* v. *Stuart,* 96 Mich. 193 (21 L. R. A. 580) ; *Union Bridge Co.* v. *United States,* 204 U. S. 364 (27 Sup. Ct. 367).

In 1917 a large number of young men were in the military camps of the State; many of them in training for service in the World War. Prompted by this fact the State board of health took up and considered at length the measures to be adopted for the control of venereal diseases. A committee was appointed to prepare rules and regulations looking to that end. The committee acted but the regulations and rules suggested by it were not adopted by the board as a board. Under these circumstances we need not consider the question as to whether such rules and regulations would be a protection to these defendants if they had been adopted. Not having been adopted by the board they cannot be here considered as a defense to this action. As the events occurred prior to the enactment of Act No. 272, Pub. Acts 1919, the laws existing prior thereto only are to be considered.

Dr. Carney was the health officer of the city of Alma and had likewise been appointed an inspector by the State board of health pursuant to the provisions of section 5018, 1 Comp. Laws 1915. He was, therefore, clothed with such authority as the statutes gave to inspectors of the State board of health and to the health officers of local boards of health. He was the instrument through which both acted. Broad powers were conferred upon the State board of health by the legislature; general language was used. By section 4989, 1 Comp. Laws 1915, it was provided:

"The State board of health shall have the general supervision of the interests of the health and life of the citizens of this State."

Local boards of health were likewise given broad powers in cases of communicable diseases. By section 5055, 1 Comp. Laws 1915, it was provided:

"When any person coming from outside the county or residing in any township, city or village within this State shall be infected or shall lately before have been infected with a dangerous communicable disease, the board of health of the township, city or village where such person may be shall make effectual provision in the manner in which it shall judge best for the safety of the inhabitants, and it may remove such sick or infected person to a separate house if it can be done without danger to his health, and shall provide nurses and other assistance and necessaries which shall be at the charge of the person himself, his parents or other persons who may be liable for his support, if able." * * *

This section as it appears in the compilation of 1915 is as it was finally amended by Act No. 98, Pub. Acts 1909, it having been amended in 1903 by Act No. 7 of the Public Acts of that year. These amendments had to do solely with the auditing of bills and the raising of funds to meet them and did not alter or change the power of the board of health in cases of communicable diseases. In section 4424, 1 Comp. Laws 1897, will be found the law as it existed prior to these amendments and the portion of the statute above quoted will be there found. In *Township of Cedar Creek* v. *Board of Sup'rs of Wexford Co.*, 135 Mich. 124, Chief Justice HOOKER, speaking for the court, said:

"The health board has large discretionary powers, made necessary by the fact that it is an emergency board. When it has reason to fear danger from diseases which are generally recognized as communicable and dangerous to the public health, a court may be justified in taking judicial notice that the disease is within the statute, which in plain terms includes *all* diseases where there is danger to the public health

from a threatened spread of the disease. There may be other diseases which the courts can judicially know not to be within the statute; but there are still others where it cannot be a matter of judicial notice. * * * Within reasonable bounds, at least, the health officer's conclusion that a disease is communicable, and is a menace to public health, must be conclusive; otherwise the efficiency of health officers and boards would be seriously lessened, for persons would be likely to hesitate about furnishing necessary medicines and other commodities, and rendering services, if it involved the danger of review by another board, with power to disallow claims upon the ground that the disease was not within the statute, or the goods furnished were not necessary."

The case of *Highland* v. *Schulte*, 123 Mich. 360, is a leading case and has been frequently cited by the courts of other States. In that case the plaintiff occupied the east half of a two-family dwelling. Smallpox existed in the family occupying the west half. Defendants, constituting the board of health of Detroit, quarantined the entire building although there were no connecting passages between the homes and plaintiff had not been exposed to the disease. He brought the action to recover his damages occasioned by the quarantine. This court held there was no liability and that defendants were authorized to make the regulations requiring that double houses be quarantined where smallpox breaks out in one of the homes.

But in *Hurst* v. *Warner*, 102 Mich. 238 (26 L. R. A. 484, 47 Am. St. Rep. 525), this court held that a rule of the board of health requiring the inspection of baggage of *all* immigrants irrespective of whether they came from localities where communicable disease existed or not was broader than the power conferred upon the board by section 5011, 1 Comp. Laws 1915, as it then existed. I shall have occasion to refer to this case later.

I quote some excerpts from the article on "Health" in Ruling Case Law:

"Generally, the authority of boards of health or other bodies designated to act as boards of health, is prescribed by general enactments of the legislature or by municipal charters. For the protection of the health of the community, the most extensive powers may be conferred on such boards whether State or local. Whatever doubt there may be as to the extent of powers not expressly conferred, there can be no question that the legislature may invest them with the most ample authority within the locality in which they are to act. And while, being creatures of statute, they have only such powers as the statutes confer, it is well settled that the authorizing acts should be construed liberally in order to effectuate the purpose of the legislature; and this notwithstanding that the liberty of individual citizens may largely be involved." 12 R. C. L. p. 1268.

"Generally, what laws or regulations are necessary to protect the public health and secure public comfort is a legislative question, and appropriate measures intended and calculated to accomplish these ends are not subject to judicial review. So the courts have no jurisdiction to interfere with the acts of health authorities except in cases of palpable abuse of the discretion conferred. The judgment of the court should not be substituted for the judgment of the board of health. Moreover, every reasonable presumption should be indulged in favor of the validity of the action of health authorities." 12 R. C. L. p. 1273.

"One of the most important of all health regulations is that directed to the exclusion of communicable diseases and the keeping of such diseases, when they have once gained an entrance, within the smallest possible limits, and providing for the establishment and enforcement of regulations by which their general dissemination shall be prevented and their continued existence rendered improbable or impossible. Power to make quarantine regulations is one of the most frequent powers conferred upon boards of health.

Such regulations constitute a proper exercise of the police power. Under this power regulations may be adopted which provide for the isolation of persons who have infectious and contagious diseases, and which prevent persons so affected from coming, or which prohibit infected goods from being carried, within the jurisdiction of the board. It is common knowledge that contagious diseases may be communicated by those who have been exposed to the disease; and it is the common practice for the health authorities to detain all such persons from going abroad so long as the danger is imminent from those who have been exposed." 12 R. C. L. p. 1289.

In *Allison* v. *Cash*, 143 Ky. 679 (137 S. W. 245), it was said by the court:

"A board of health is an instrumentality of government created for convenience and invested with such powers as will enable it to protect the general health of the people of the State, county or community over which it is given jurisdiction. As said in 21 Cyc. pp. 394, 395:

" 'The power to remove and quarantine persons who have been infected with communicable diseases, or exposed to contagion, need not, however, be conferred on sanitary authorities in express terms; but may be implied from the general power to preserve the public health, or to guard against the introduction or spread of contagious diseases. * * * Under powers similar to those which authorize the establishment of quarantine, sanitary authorities may require the disinfection not only of property that has actually been exposed to contagion, but of all articles liable to convey infection, especially where it is impossible to ascertain their history or the place from which they originally came.' * * *

"It seems to be well settled that a health officer, who by statute is authorized to take action for the prevention of the spread of disease, is not liable for injuries resulting from such reasonable and customary measures as he may in good faith adopt or direct for that purpose with regard to persons or matters subject to his jurisdiction."

216—Mich.—19.

The detention in quarantine of persons infected with communicable diseases has long been recognized by the medical profession and the public at large as one of the most effective measures that may be taken to prevent their spread. Such measures have uniformly been held to be within the police power of the State. The health of the people is of supreme importance to the State, and measures reasonably calculated to promote the public health have with uniformity been sustained. The statute I have quoted from gives the power to the board of health to detain in quarantine persons infected with a communicable disease. I think the question of whether the persons shall be detained in a detention hospital or in their own homes must be left to the honest judgment of the duly constituted authorities. The purpose of the quarantine is isolation, prevention of infection. If this can, in the honest judgment of the health officer, be better secured by detention in a hospital, and the health officer so decides, it is not for the courts to override such decision and substitute their judgment for that of those skilled in the healing art and intrusted by the law with the determination of the question.

The power to quarantine carries with it in my judgment as a necessary incident to the exercise of such power the right to examine one whom the health officer has reasonable grounds to believe is infected with the communicable disease. But the legislature has not left this subject in doubt. Section 5091, 1 Comp. Laws 1915, provides in part as follows:

"That whenever the health officer of any township, city or village in this State shall receive reliable notice or shall otherwise have good reason to believe that there is within the township, city or village of which he is the health officer, a case of smallpox, diphtheria, scarlet fever or other communicable disease dangerous to the public health, it shall be the duty of said health

officer, unless he is or shall have been instructed by the board of health of which he is an executive officer, to do otherwise, immediately to investigate the subject, and in behalf of the board of health of which he is an executive officer, to order the prompt and thorough isolation of those sick or infected with such disease, so long as there is danger of their communicating the disease to other persons." * * *

Our State has not been alone in dealing with the question of the control of venereal diseases. With the advent of the World War and the congregation of a large number of young men in military camps the necessity of control of venereal diseases forced itself upon the attention of the health officers of other States, and the courts of some of these other States have been called upon to determine the power of such boards in the premises. So far as I have been able to ascertain, the following are all the cases dealing with the specific questions of power to examine and quarantine those infected with venereal diseases which have arisen from this situation: *Wragg* v. *Griffin*, 185 Iowa, 243 (170 N. W. 400, 2 A. L. R. 1327); *In re McGee*, 105 Kan. 574 (185 Pac. 14, 8 A. L. R. 831); *State, ex rel. McBride*, v. *Superior Court*, 103 Wash. 409 (174 Pac. 973); *In re Hardcastle*, 84 Tex. Crim. Rep. 463 (208 S. W. 531); *In re Brooks*, 85 Tex. Crim. Rep. 397 (212 S. W. 956); *In re Johnson*, 40 Cal. App. 242 (180 Pac. 644); *In re Dillon* (Cal. App.), 186 Pac. 170; *In re Travers* (Cal. App.), 192 Pac. 454; *In re Shepard* (Cal. App.), 195 Pac. 1077; *Dowling* v. *Harden* (Ala. App.), 88 South. 217; *Brown* v. *Manning*, 103 Neb. 540 (172 N. W. 522).

The case of *Wragg* v. *Griffin* must be accepted as sustaining the contention of plaintiff's counsel, while the balance of the cases tend to sustain the contention of defendants' counsel. It should be said in passing, however, that the Texas cases hold that upon *habeas corpus* the question of fact as to whether the detained

person is infected with a venereal disease may be tried out, and the California courts seem to have adopted that practice (*In re Travers, supra*).   I am persuaded that in the absence of fraud or arbitrary action on the part of the examining health officer, his conclusion is final and that this question is foreclosed in this State by the reasoning of the case of *Township of Cedar Creek* v. *Board of Sup'rs of Wexford Co., supra.*   In *State, ex rel. McBride,* v. *Superior Court, supra,* the court concluded its opinion with the following statement:

"Finally, we hold that it is within the power of the legislature, in dealing with the problems of public health, to make the determination of a fact by a properly constituted health officer final and binding upon the public as well as upon the courts."

And in *Re McGee, supra,* it was said:

"In the application for the writ it is stated that the petitioners are not diseased.   The question is one of fact, determinable by practically infallible scientific methods.   The city health officer was authorized to ascertain the fact.   He has certified to the existence of disease, and, in the absence of a charge of bad faith, or conduct equivalent to bad faith, on his part, his finding is conclusive."

The purpose of these measures to prevent the spread of venereal diseases is thus stated in *Re Brooks, supra:*

"The object of the law is not punishment for the unfortunates who are afflicted with these maladies, so easily transmitted and so fearful in results, but the well being of these and the remainder of the people."

Again I quote from the *McGee Case:*

"The rules of the State board of health and the city ordinance are assailed as unreasonable.   In this instance only those provisions of the rules of the State board of health and of the city ordinance are in-

volved which relate to isolation of persons who have been examined and have been found to be diseased. Reasonableness of provisions relating to discovery and to examination of suspects need not be determined. It may be observed, however, that while provisions of the latter class cut deeply into private personal right, the subject is one respecting which a mincing policy is not to be tolerated. It affects the public health so intimately and so insidiously that consider-ations of delicacy and privacy may not be permitted to thwart measures necessary to avert the public peril. Only those invasions of personal privacy are unlawful which are unreasonable, and reasonableness is always relative to gravity of the occasion. Oppor-tunity for abuse of power is no greater than in other fields of governmental activity, and misconduct in the execution of official authority is not to be presumed."

An examination of the authorities, a consideration of our own statutes, having in mind the rule that they should be liberally construed in order that the aim intended, *i. e.*, the good of the public health, should be attained, leads me irresistibly to the conclusion that we should hold: That the State board of health has validly determined that gonorrhea and syphilis are communicable diseases; that the power exists in the boards of health acting through their respective health officers to quarantine persons infected with these diseases either in their homes or in detention hospitals, such detention to continue so long as the diseases are in their infectious state; and that, subject to what will now be considered, such health officer has the power to make such examination as the nature of the disease requires to determine its presence.

I have said that I thought the health officer had the power to make the examination. When may that power be exercised? Indiscriminately? May he send for every man and woman, every boy and girl of the vicinage and examine them for these disorders? I think not. Section 5091, 1 Comp. Laws 1915, says

that he may investigate the subject when he "shall receive reliable notice or shall otherwise have good reason to believe." *Hurst* v. *Warner, supra,* places the ban on the indiscriminate inspection of the baggage of *all* immigrants, and the case of *In re Dillon, supra,* quite fully considers this question. After holding that the circumstances of that particular case did not furnish reasonable grounds for making the examination, and after considering the question at some length, the court announces this rule:

"Where sufficient reasonable cause exists to believe that a person is afflicted with a quarantinable disease, there is no doubt of the right of the health authorities to examine into the case and, in a proper way, determine the fact. Such preliminary investigation must be made without delay, and, if quarantining is found to be justifiable, such quarantine measures may be resorted to only as are reasonably necessary to protect the public health, remembering that the persons so affected are to be treated as patients, and not as criminals."

Dr. Carney had the power to make the examination but he could not exercise such power unless he had reasonable grounds to believe that plaintiff was infected. Such good faith on his part was a necessary prerequisite to the exercise of the power. I am unable to follow the contention of defendants' counsel that this record establishes such good faith. Dr. Carney was not sworn as a witness and it did not appear from any testimony introduced in the case that he had any information with reference to plaintiff, her habits or her conduct, which would give him reasonable grounds to believe that she was infected with either of the diseases named. In the absence of such testimony I think the trial judge was in error in directing a verdict for defendant Carney. What information defendant Carney had was within his own knowledge and not within the knowledge of the plaintiff.

The trial judge required plaintiff's counsel to elect as to which defendant he would proceed against. This ruling is of doubtful propriety, but plaintiff was not harmed by it.   Defendants Peck and Corrigan both had before them the certificate of Dr. Carney that plaintiff was infected with a communicable disease, gonorrhea; both had before them the papers signed by plaintiff.   The certificate of the doctor was sufficient grounds for a reasonable belief that plaintiff was infected with this disease and furnished a protection for their acts.

After the connection of defendant Carney with Mr. Martin was shown in the case, as it was shown, it was competent to prove what Mr. Martin said to plaintiff.   Such testimony was not competent when it was first offered.   The other assignments of error have been considered but do not merit discussion.

I think the case should be reversed for the error pointed out, and that the costs should abide the final result.

STEERE, C. J., and SHARPE, J., concurred with FELLOWS, J.

WIEST, J. (*concurring in part*).   The judgment should be reversed, but I am not willing to go the whole length of the opinion of Mr. Justice FELLOWS relative to the powers of boards of health and health officers.   I do not deem it necessary to state in full the limitations upon the powers to be exercised by health officers, but leave decision thereon until the proper case arises. It is sufficient to pass upon what was done here and determine whether, under the evidence, a case was presented for the consideration of the jury.

There is power to protect the public health; it is vested by law in public health boards to be exercised through reasonable rules and regulations duly promulgated.   Whether such rules and regulations are

lawful and reasonable, considering the true end in view and personal rights guaranteed citizens by the Constitution, constitute judicial questions beyond the power of the legislature to foreclose.

Arbitrary power, beyond the reach of redress open to an injured citizen, is not vested in boards of health or anywhere else under our system of government. While courts may well be loath to review health regulations, promulgated by an executive board under legislative delegated authority, yet in a proper case the duty exists, and no board by executive action can close the court and succeed in having its officers remain immune from judicial inquiry when a claimed unlawful exercise of authority has been visited upon a citizen and redress is asked.

Courts may be controlled by the determination of an executive board skilled as to what constitutes a dangerous communicable disease and may not attempt to review such classification, but the method adopted or exercised to prevent the spread thereof must bear some true relation to the real danger, and be reasonable, having in mind the end to be attained, and must not transgress the security of the person beyond public necessity.

Measures to prevent the spread of dangerous communicable diseases and to provide for the isolation and segregation of those diseased are practically as old as history.   It has been said that:

"The history of pestilence is the history of quarantine."

The law of Moses segregated the lepers and their forced cry of "unclean, unclean," was the forerunner of the modern warning placard.   Ancient Rome and Greece had their systems under which those infected with leprosy were separated from the well.   In 1448 the senate of Venice instituted a code of quarantine,

and a few years earlier a regularly organized laza-
retto, or pesthouse, was established.

"The republic of Venice also established the first
board of health.    It consisted of three nobles, and was
called the council of health.    It was ordered to investi-
gate the best means of preserving health, and of pre-
venting the introduction of disease from abroad.    Its
efforts not having been entirely successful, its powers
were enlarged in 1504, so as to grant it 'the power of
life and death over those who violated the regulations
for health.'    No appeal was allowed from the sentence
of this tribunal."    91 North Am. Rev. p. 442.

During the plague in London in 1665, the magis-
trates consulted to devise means for stopping, or at
least impeding the progress of the disease, and the
result of their deliberations was a series of orders
which appointed commissioners, searchers, chirur-
geons, and buriers, to each district, acting under cer-
tain regulations, and which directed the provisions
of an old act of parliament to be in force, for shutting
up all such houses as appeared to the proper officers
to contain any infected person, and every house which
was visited, as it was called, was by those orders
marked with a red cross of a foot long in the middle
of the door, evident to be seen.    See 22 Littell's Liv-
ing Age, p. 227.    The act of parliament mentioned was
passed in 1603.

The law has not yet conferred upon boards of health
the old time custom of the Samnites of examining the
conduct of the young people or of holding general in-
quisition for the discovery of venereal disease.    The
board of health has no legislative power; it may, under
delegated power, enact rules and regulations for the
protection and preservation of the public health, but
must steer clear of combining legislative with execu-
tive power; in other words, such board cannot give
itself power and then execute the power.    I have
been unable to lay my finger upon any statute author-

izing or even sanctioning by inference the procedure here adopted. I recognize the need of full power to stay the spread of epidemic diseases and I find such power in the statute, but I cannot find there that, by the mere determination that a disease is dangerous and communicable, there follows power at the will of a health officer to refuse isolation in the home by quarantine and placard notice thereof and to commit the diseased person to a hospital. If the law conferred the power exercised by the health officer in this instance, then children with any one of the numerous diseases now declared dangerous and communicable could be taken from their homes and sent to a hospital.

Act No. 272, Pub. Acts 1919 (enacted since the acts complained of), expressly relates to venereal diseases. If the power existed before this law then it was a general power and still exists and covers all diseases determined as dangerous and communicable, and the law of 1919 has neither added to nor taken from such power.

And right here arises the question of whether the exercise of the power by the defendant officer in refusing this girl right of quarantine in her own home was an unreasonable act and not warranted by menace to the public health, and her confinement in the detention hospital an unlawful restraint of her person. This presented an issue of fact for the jury and the trial judge was in error in directing a verdict for defendant.

The restraint over the person of plaintiff being made to appear, the burden was upon defendants to justify the same under the authority of some law. It would be an intolerable interference by way of officious meddling for health officers to assert and then assume the power of making physical examination of girls at will for venereal disease. The law of 1919 points out methods for bringing venereal cases to the atten-

tion of health officers, but does not sanction what plaintiff claims was done in this case, and surely the power of defendant was not more without law upon the subject than it is now with law.

I agree with my Brother that, if the health officer had power at all to examine plaintiff, he had no right to exercise it without reasonable cause, such cause to precede examination and in no way to depend upon the result of examination. In any event the defendant had no right to suspect and examine plaintiff so long as she had no accuser.[1]

MOORE, STONE, and BIRD, JJ., concurred with WIEST, J. CLARK, J., did not sit.