# HUFFMAN v. DISTRICT OF COLUMBIA.
## No. 211.

Municipal Court of Appeals for the
District of Columbia.

Oct. 31, 1944.

Leon L. Sclawy, of Washington, D. C., for appellant.

Vernon E. West, Principal Assistant Corporation Counsel, of Washington, D. C., with whom Richmond B. Keech, Corporation Counsel, and Hubert B. Pair, Assistant Corporation Counsel, both of Washington, D. C., were on the brief, for appellee.

Before RICHARDSON, Chief Judge, and CAYTON and HOOD, Associate Judges.

CAYTON, Associate Judge.

Appellant, an employee of the Federal Government, was on her way home from a dance one Saturday night not long after midnight and when within a block or so of her home was accosted by three soldiers standing in front of a tavern. One of them who admitted he was "pretty intoxicated" offered to walk her home. He claimed that she invited him to her apartment and that they there had sexual relations. About three days later he observed symptoms which he reported to his superiors and which were diagnosed as those of acute gonorrhoea. He claimed to have received from appellant a slip of paper with her telephone number. He also claimed that she told him her name and where she was employed. In reporting the matter to his superior officer, he supplied the name he said she had given him but which, it later developed, was not her true name.

Through military channels the matter was reported to the District of Columbia Health Officer. A woman army doctor, detailed to the local Health Department and in charge of the venereal disease bureau, went to appellant's apartment. She did not gain entrance but attempted to conduct a conversation through the closed door, though a dog was barking very loudly inside the apartment. Government evidence showed that on the mailbox for appellant's apartment there was another name in addition to hers. It was also admitted that it was impossible to know how many people were inside the apartment at the time of the conversation, whether appellant was one of them, or who it was who had the conversation with the government physician. The physician then went to a nearby telephone and called appellant's apartment. She did not ask for her by name but "requested" that the person at the other end of the wire report for a physical examination at the Public Health Service Office. That person replied that she had referred the matter to her lawyer. (She had previously had a telephone call from the Health Department.) In neither of the two conversations just mentioned was the voice of the person inside the apartment identified. The physician admitted that appellant's attorney told her over the telephone the following day that he had medical proof that appellant was free of disease and that he offered to have his client submit to additional examination by any other physician in the city, selected at random by the Health Department.

There was also evidence that the attorney had called the Health Department earlier and had complained that one of its employees had charged his client with having a venereal disease. The Health Department record which was in evidence, referred to such conversation and recited "transcript follows"; but such transcript was not included in the government's evidence, nor was its omission explained. Several days later the same government physician applied for a warrant in the trial court and made oath that appellant was "a person having reasonable grounds to believe that she is affected with a communicable disease, to wit, gonorrhoea is not properly isolated and quarantined in the home, and facilities are lacking for proper isolation and quarantine therein, and who by reason of her non-cooperation and carelessness, in the opinion of the Health Officer of the District of Columbia endangers the public health."

An information was filed in two counts, the first reciting the allegations of the affidavit just referred to, and the second charging that defendant being a person suspected of having a communicable disease (gonorrhoea) refused to submit to an examination by the Health Officer.

The substance of the testimony in behalf of the government is as we have just recited it (with certain additions we shall mention later). The trial judge overruled defense motion for a dismissal on the government's case, which motion was based on the claim of lack of evidence.

During the defense case, the trial judge first refused to permit testimony by a physician called by defendant, that he had examined her; he then refused to allow the physician to tell the result of his examination. Also he refused an offer of the defendant to prove by four more physicians that defendant had no venereal disease of any kind.

In the interest of continuity we have grouped the points somewhat differently than in the manner they were discussed in the briefs. We have decided (1) that the statute involved is constitutional; (2) that the Commissioners' regulations are reasonable; and (3) that the evidence did not warrant a conviction.

### 1. *Constitutionality of the Statute:*

The Statute in question (Code 1940, § 6—118, 53 Stat. 1408) provides:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Commissioners of the District of Columbia are hereby authorized and empowered to promulgate and enforce all such reasonable rules and regulations as they may deem necessary to prevent and control the spread of communicable and preventable diseases in the District of Columbia."

■■ We hold that the legislation constitutes a legitimate exercise of the police power in an effort to prevent the spread of communicable disease. This is a proper concern of the legislature and will not be invalidated by the courts so long as the statute is not oppressive, arbitrary or unreasonable. The act has a direct relation as a means to an end and the end itself is legitimate, for there is no question that the general health of the public is a prime and proper concern of the legislature. Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765; Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385; Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923; People ex rel. Baker v. Strautz, 386 Ill. 360, 54 N. E.2d 441; People ex rel. Barmore v. Robertson, 302 Ill. 422, 134 N.E. 815, 22 A.L.R. 835; Ex parte McGee, 105 Kan. 574, 185

P. 14, 8 A.L.R. 831; Ex parte Lewis, 328 Mo. 843, 42 S.W.2d 21; Ex parte Caselli, 62 Mont. 201, 204 P. 364; Ex parte Company, 106 Ohio St. 50, 139 N.E. 204; Ex parte Roman, 19 Okl.Cr. 235, 199 P. 580. Cf. Colvill v. Fox, 51 Mont. 72, 149 P. 496, L.R.A.1915F, 894.

■ Subject therefore to the requirement which the statute itself imposes—that the regulations adopted thereunder be reasonable, we hold that the statute does not impinge upon the constitutional rights of defendant. Nor is the language too broad in its delegation of power to the Commissioners. See People ex rel. Barmore v. Robertson, supra.

### 2. *Reasonableness of the Commissioners' Regulations.*

One of the regulations adopted by the Commissioners (Section 4) reads:

"Upon receiving a report of the existence of a case, or suspected case of a communicable disease, or a communicable disease carrier, the Health Officer shall make such investigation as he may deem necessary for the purpose of determining the source of infection and for the restriction of movement, isolation, or quarantine of such cases and carriers, and of contacts, and to this end may enter upon and inspect any public or private property in the District of Columbia. Any person having or suspected of having a communicable disease, any person who is a communicable disease carrier, or contacts of such persons shall submit to an examination by the Health Officer for the purpose of determining the existence of a communicable disease or carrier. Such persons and contacts of such persons shall submit specimens of body secretions, excretions, and discharges for laboratory examination on request of the Health Officer."

Another of the regulations (Section 5) reads:

"When, in the opinion of the Health Officer, any person who is affected by any of the diseases listed in this section is not properly isolated or quarantined in the home, or facilities are lacking for proper isolation or quarantine therein, or who by reason of his or her non-cooperation, or carelessness, in the opinion of the Health Officer endangers the public health, such person shall be removed to a hospital or other place approved by the Health Officer."

■ We have studied these regulations in the light of what has been done and what may be done in their enforcement, and with the principle clearly in mind that the regulations must bear a reasonable relation to the evils they seek to correct.

■ Judged by these tests we hold that the regulations are not unreasonable. True, they make no distinction between such diseases as scarlet fever and diphtheria, on the one hand—diseases which are infectious and are spread through the air we breathe and may thus become epidemic overnight—and on the other hand the venereal diseases which are communicated only through personal contact. But we recognize that to meet varying conditions and situations of varying danger to public health, there must be some generality and flexibility in the regulations. The ultimate test might often be whether there was reasonableness in the administration of the provision.

It is true also that the regulations as presently worded do not make different provisions for dealing with known prostitutes and women (or men) who are presumably reputable. It may be that the Commissioners in framing the regulations had in mind that the vagrancy statute, Code 1940, § 22—3301, already gave the police authority to take prostitutes into custody; and that once in custody they could be required to submit to routine examination. Compare Ex parte Arata, 52 Cal.App. 380, 198 P. 814; Ex parte Lewis; Ex parte Roman; and People ex rel. Baker v. Strautz, all cited above. It may also be that the Commissioners assumed that the Health Department would not act ruthlessly, nor apply the same techniques to respectable citizens as to known prostitutes.

But we are not passing upon the wisdom or unwisdom of the regulations. We limit ourselves to inquiring whether the Commissioners have framed such regulations as will, if enforced reasonably, and without malice, caprice or oppression, serve "to prevent and control" the spread of disease. We think it clear that the regulations meet that test, and that had they been enforced with due regard for "the basic concepts of fair play" prescribed by the Supreme Court for administrative action,[1] there would have been no cause for complaint—indeed it may reasonably be argued that there would probably have been no prosecution. It must be remembered that neither the statute nor the regulations are criminal in nature. They are administrative only; and the penal feature is not brought into play until the administrative process has been exhausted. Here, as we now proceed to explain, the administrative process was not reasonably or properly employed.

### 3. Sufficiency of the Evidence.

The government made two charges: (1) That appellant herself had reasonable ground to believe she was infected and that she lacked means of isolation and quarantine, and (2) that she was a person suspected *by the Health Department* of being infected, and refused to submit to an examination.

From its first position the government was obliged to retreat, even after the trial judge had ruled in its favor on the defense motion for a dismissal at the end of the government's case. While defense counsel was attempting to offer his evidence the prosecutor announced that he thought the motion had been well taken, and should have been granted, but upon different grounds than those urged by defendant. Then it was, after some discussion, that the trial judge announced that he would grant the motion and dismiss the first count "on grounds that I deem valid"—grounds incidentally which were never spread on the record and as to which appellant (and this court as well) was left in the dark.

■ At any rate the first count, charging appellant with knowledge of a diseased condition, was abandoned when defendant was proceeding to meet it in force, by the testimony of five medical witnesses. But, as we see it, there should not have been a conviction on either count. The composite evidence cannot be said to support the claim that the Health Department physician had "reasonable suspicion" that defendant was infected. We need not emphasize the fact that defendant's accuser was admittedly drunk at the time of the alleged contact, nor point to variances between his testimony in court and in his report to his military superiors.[2] We are not basing our decision upon mere weakness or contradic-

---

[1] Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129.

[2] (He clearly contradicted himself as to whether the contact had taken place on a Saturday or a Tuesday. In court he said that he had seen defendant on the street passing by his post of duty for about two years but had never met or spoken with

tions in the evidence. What we decide is that it was completely insufficient to support a conviction.

■■ The testimony of the government physician did not make out a case of reasonable suspicion, a phrase which the corporation counsel says is synonymous with reasonable grounds to believe that appellant had the disease. True enough, there may initially have been ground for reasonable suspicion that appellant was infected, on the basis of the soldier's report. We think it would have justified investigation, as authorized by the regulation. But the situation was swiftly removed from the area of suspicion when defendant's attorney offered to prove to the health officer that his client was free of all infection, and offered to submit her for additional examination by any doctor in the city, selected at random by the Health Department. In this offer the government physician showed no interest. It seems rather clear that she was determined to force appellant into her office for examination, or prosecute her. Her "reasonable suspicion" must be considered in the light of her statement on the stand that members of the public who have been reported "can be supposed to have the disease until proven otherwise." We cannot refrain from saying that if that statement reflects the policy of the Health Department the policy needs prompt correction. Such a policy is dangerous, and has no foundation in law or reason. Moreover it is clearly repugnant to the rule of fair play which the Supreme Court has said must attend administrative procedures. There is no fair play in taking house-wife, wage earner, adolescent school girl, prostitute and vagrant, lumping them into one group and subjecting them indiscriminately to having their reputations blown away like the frost upon a window-pane; and just as quickly and irretrievably. Specifically, the burden is not upon the person suspected, unless she be a known prostitute. It is, when the accuracy of the charge or the reasonableness of the suspicion is put in issue, upon the health officer. Ex parte Arata, Ex parte Roman, both supra, and In re Milstead (Ex parte Dillon), 44 Cal. App. 239, 186 P. 170.

■ Also it should be said that in the trial itself there was no evidence of a proper request and refusal to submit to examination. The jumbled conversation through a locked door, drowned out by the loud barking of a dog, with a person *whose voice was never identified* should not have been accepted as proving so important an element in the case. The same is true of the telephone conversation which followed. We do not say the evidence may not have been, in a technical sense, admissible. But its probative value was very slight at best.

As we view the matter, there was no immediacy in this situation to justify the Health Department in dispensing with an orderly procedure, reasonably calculated to give a citizen the right to refute such an accusation. Though, as we have pointed out, it was not a criminal charge, it did involve a grave social stigma.

■ Also, it was not the kind of infection which constituted an immediate threat to the public health. A case of smallpox, for example, with potential danger to the whole community, may require summary action for the protection of the public health. But gonorrhoea is communicable only under very limited conditions (Principles of Venereal Disease Control, United States Public Health Service, p. 48); and the public health does not require such summary action in dealing with a suspected case. Appellant was notified in a most informal manner that she had been reported as exposed to a contagious disease and that the official of the Health Department wished permission to examine her. She was not told of what disease she was suspected nor when or where the examination would take place. Nor was she informed of the name of her accuser. An emergency may require and justify summary action, but where no such emergency exists some orderly procedure ought to be followed.

Because it was not followed in this case, and because the regulations were not reasonably enforced, we must reverse the judgment of conviction.

NOTE: The foregoing is the unanimous opinion of the court. What follows is the individual opinion of Judge CAYTON, and expresses views with which the majority of the court does not concur.

It was error to reject the defense offer

---

her; in his military report he claimed to have known her for seven months and to have been introduced to her by a friend. In court he said that he was quite drunk and staggering; in his military report he said only that he had been "drinking moderately.")

of medical testimony that she was free of infection. It had a direct bearing on defendant's contention that she was completely innocent. Just as the health officer should not have refused to listen to this offer before making the charge in court, so the trial judge should not have rejected it; for it would have assisted him in considering the issue of reasonable suspicion, the equally important issue of refusal to submit to examination and the even more important—because more basic—question as to whether it was physically or medically possible for her to have transmitted the causative organism of gonorrhoea. A lay witness.was permitted to say that she had infected him; yet she was refused permission to prove by scientific testimony that it was impossible. How can it be said that there was no relevancy in the testimony of five medical witnesses that she could not have infected the complaining soldier or anyone else, because she was herself free of infection—in short, that appellant represented not even the slightest danger to the health of the community for whose benefit the regulations were made?

Reversed and remanded for further proceedings in accordance with this opinion.